Case No. 21-11016

In the United States Court of Appeals
for the Eleventh Circuit

---

Mary E. Harris,
Appellant

v.

Public Health Trust of Miami-Dade County,
Appellee

---

On appeal from the United States District Court
for the Southern District of Florida

---

**Appellant's Opening Brief**

---

Thomas V. Burch
Anna W. Howard
Courtney Hogan, Student Counsel
Kirstiana Perryman, Student Counsel
Appellate Litigation Clinic
University of Georgia School of Law
225 Herty Drive
Athens, Georgia 30602
tvburch@uga.edu
(706) 542-5236

## Certificate of Interested Persons, Mary Harris v.
## Public Health Trust of Miami-Dade County, Case No. 21-11016

We file this Certificate of Interested Persons and Corporate Disclosure Statement in accordance with Eleventh Circuit Rule 26.1-1:

1. Blye, Tanesha (Counsel for Plaintiff)

2. Burch, Thomas (Counsel for Appellant)

3. Candela, William (Counsel for Defendant)

4. Farrell, Michael (District Director, EEOC Miami District Office)

5. Harris, Mary (Plaintiff-Appellant)

6. Hogan, Courtney (Student Counsel for Appellant)

7. Howard, Anna (Counsel for Appellant)

8. Jackson Health System (Operator of Defendant's Medical Centers)

9. Jackson Hospital Ambulatory Clinic (Medical Center Operated by Defendant)

10. Jackson Memorial Hospital (Hospital Operated by Defendant)

11. Jackson North Medical Center (Hospital Operated by Defendant)

12. Jefferson Reeves Ambulatory Clinic (Clinic Operated by Defendant)

13. Louis, Honorable Lauren Fleischer (Magistrate Judge, United States District Court for the Southern District of Florida)

14. Miami-Dade County Attorney's Office (Counsel for Defendant)

15. Moore, Honorable K. Michael (Chief Judge for the United States District Court for the Southern District of Florida)

16. Perryman, Kirstiana (Student Counsel for Appellant)

17. Price-Williams, Abigail (Miami-Dade County Attorney)

18. Rawsi Williams Law Group (Counsel for Plaintiff)

19. Rodriguez, Eric (Counsel for Appellee)

20. Saenz & Anderson, PLLC (Counsel for Plaintiff)

21. Saenz, R. Martin (Counsel for Plaintiff)

22. Smukler, Aron (Counsel for Plaintiff)

23. University of Georgia School of Law Appellate Litigation Clinic (Counsel for Appellant)

24. Williams, Rawsi (Counsel for Plaintiff)

## Statement Regarding Oral Argument

This appeal addresses the district court's grant of summary judgment to Public Health Trust on Ms. Harris's employment discrimination claims. Ms. Harris is a Black woman who alleges that she faced persistent race discrimination at work, including her direct supervisor telling her "[B]lacks are lazy, and don't like to work." Ms. Harris reported that comment, but the supervisor was never disciplined, and Ms. Harris alleges that after she reported, the supervisor began following her around the workplace, denying her access to the nurses' supply closet, asking a co-worker if he had any pictures or information that would support getting her fired, and instructing another supervisor to discipline her—all of which led to a sharp increase in her workplace discipline over the following year. We believe Ms. Harris's evidence is direct, severe, pervasive, and related enough to make summary judgment inappropriate on her disparate treatment, hostile work environment, and retaliation claims. Because of that, we respectfully request oral argument.

## Table of Contents

Statement Regarding Oral Argument..............................................................i

Table of Citations ................................................................................ iv

Statement Regarding Jurisdiction...........................................................viii

Statement of the Issues ........................................................................ 1

Statement of the Case .......................................................................... 2

Standard of Review .............................................................................. 8

Summary of the Argument ..................................................................... 8

Argument ........................................................................................ 14

I.    Ms. Harris presented direct evidence of discrimination, making summary judgment on her disparate treatment claim inappropriate..............15

II.   Public Health Trust created a hostile work environment, as shown in part by the background evidence that the district court did not consider .......................................................................................... 18

      A. Ms. Harris referenced time-barred events as background evidence to support her hostile work environment claim, and the district court should have considered those facts ...................................20

      B. Under the totality of the circumstances analysis, a reasonable juror could find that Ms. Harris endured severe or pervasive harassment ..........................................................................................22

           1. Ms. Harris was harassed daily by her direct supervisor, who believed that "Blacks are lazy" ...........................................23

           2. A reasonable person could find that a supervisor making a racist statement and conspiring to get an employee fired was severe harassment ..........................................................24

3. Ms. Harris endured both threatening and humiliating harassment ...................................................................26

4. The harassment unreasonably interfered with Ms. Harris's job performance and altered the terms and conditions of her employment ......................................................................29

III. Ms. Harris established a prima facie case for discriminatory retaliation, and she showed that Public Health Trust's nondiscriminatory explanations are pretext ....................................31

A. Ms. Harris had an objective belief that she was reporting actionable race discrimination, so her complaints were protected activities ...........................................................................32

B. Ms. Harris's disciplinary actions were causally connected to her various complaints about her direct supervisor's discrimination...............36

1. January 2016, June 2016, and August 2016 DARs.............................37

2. Three-Day Suspension ...........................................................40

3. Administrative Leave ............................................................41

4. Termination ........................................................................42

C. Ms. Harris's testimony, the timing and frequency of the disciplinary actions, and a co-worker's testimony all demonstrate that Public Health Trust's nondiscriminatory explanations are pretext...........................................................................43

Conclusion.............................................................................47

Certificate of Compliance

Certificate of Service

## <u>Table of Citations</u>

**Cases**

*Allen v. Mich. Dep't of Corr.*,
    165 F.3d 405 (6th Cir. 1999) ....................................................24–25

*Alvarez v. Royal Atl. Devs., Inc.*,
    610 F.3d 1253 (11th Cir. 2010) ....................................................... 8

*Anterio v. City of High Springs*,
    762 F. App'x 891 (11th Cir. 2019) ............................................37, 40

*Brooks v. Cnty. Comm'n*,
    446 F.3d 1160 (11th Cir. 2006) ....................................................44

*Brown v. Ala. Dep't of Transp.*,
    597 F.3d 1160 (11th Cir. 2010) ....................................................39

*\*Bryant v. Jones*,
    575 F.3d 1281 (11th Cir. 2009) ....................................................30

*Burlington Indus., Inc. v. Ellerth*,
    524 U.S. 742 (1998) .............................................................27, 29

*Burlington N. and Santa Fe Ry. Co. v. White*,
    548 U.S. 53 (2006) ...................................................................39

*Butler v. Ala. Dep't of Transp.*,
    536 F.3d 1209 (11th Cir. 2008) ....................................................35

*Caban-Wheeler v. Elsea*,
    904 F.2d 1549 (11th Cir. 1990) ....................................................17

*Chapter 7 Trustee v. Gate Gourmet, Inc.*,
    683 F.3d 1249 (11th Cir. 2012) ....................................................36

*Davis v. Legal Servs. Ala., Inc.*,
19 F.4th 1261 (11th Cir. 2021) ........................................................ 8

*Dees v. Johnson Controls World Servs.*,
168 F.3d 417 (11th Cir. 1999) ........................................................ 24

*Farley v. Nationwide Mut. Ins. Co.*,
197 F.3d 1322 (11th Cir. 1999) .................................................. 36, 43

*Freeman v. Perdue Farms Inc.*,
496 F. App'x 920 (11th Cir. 2012) ................................................. 45

*Furcron v. Mail Ctrs. Plus, LLC*,
843 F.3d 1295 (11th Cir. 2016) ................................................ 34–35

*Garret v. Tyco Fire Prods., LP*,
301 F. Supp. 3d 1099 (N.D. Ala. 2018) .......................................... 27

*Gilliam v. U.S. Dep't of Veterans Affairs*,
822 F. App'x 985 (11th Cir. 2020) ................................................. 39

*Gogel v. Kia Motors Mfg. of Ga., Inc.*,
967 F.3d 1121 (11th Cir. 2020) ..................................................... 42

*Gupta v. Fla. Bd. of Regents*,
212 F.3d 571 (11th Cir. 2000) ................................... 38–39, 41–42

*Hairston v. Gainesville Sun Pub. Co.*,
9 F.3d 913 (11th Cir. 1993) ........................................................ 45

*Harris v. Forklift Sys.*,
510 U.S. 17 (1993) ...................................................................... 23

*Jackson v. Hennessy Auto*,
190 F. App'x 765 (11th Cir. 2006) ................................................. 44

*Jackson v. State of Ala. State Tenure Comm'n*,
405 F.3d 1276 (11th Cir. 2005) ..................................................... 44

v

*Johnson v. Booker T. Washington Broad. Serv., Inc.*,
   234 F.3d 501 (11th Cir. 2000)......................................................24

*Jones v. Bessemer Carraway Med. Ctr.*,
   151 F.3d 1321 (11th Cir. 1998)...................................................47

*Jones v. City of Heflin*,
   207 F. Supp. 3d 1255 (N.D. Ala. 2016).................................45–46

*Jones v. UPS Ground Freight*,
   683 F.3d 1283 (11th Cir. 2012)...................................................25

*Keene v. Prine*,
   477 F. App'x 575 (11th Cir. 2012) .............................................46

*Lindsey v. Am. Cast Iron Pipe Co.*,
   772 F.2d 799 (11th Cir. 1985)..............................................17–18

*Meeks v. Computer Assocs. Int'l*,
   15 F.3d 1013 (11th Cir. 1994)..............................................31–32

*Mendoza v. Borden, Inc.*,
   195 F.3d 1238 (11th Cir. 1999)......................... 19, 25, 27–28

*Menefee v. Montgomery Cnty. Bd. of Educ.*,
   137 F. App'x 232 (11th Cir. 2005) .............................................21

*Merritt v. Dillard Paper Co.*,
   120 F.3d 1181 (11th Cir. 1997).................................................17

*Miles v. M.N.C. Corp.*,
   750 F.2d 867 (11th Cir. 1985)...................................................17

*Miller v. Kenworth of Dothan, Inc.*,
   277 F.3d 1269 (11th Cir. 2002)..................................................31

*Moore v. San Carlos Park Fire Prot. & Rescue*,
   808 F. App'x 789 (11th Cir. 2020) ............................................21

*Munoz v. Selig Enters., Inc.*,
  981 F.3d 1265 (11th Cir. 2020) ...................................................... 46

*Nat'l R.R. Passenger Corp. v. Morgan*,
  536 U.S. 101 (2002) ...................................................................... 21

*Reeves v. C.H. Robinson Worldwide, Inc.*,
  525 F.3d 1139 (11th Cir. 2008) ...................................................... 23

*Rodgers v. Western-Southern Life Ins. Co.*,
  12 F.3d 668 (7th Cir. 1993) ........................................................... 25

*Ross v. Rhodes Furniture, Inc.*,
  146 F.3d 1286 (11th Cir. 1998) ...................................................... 18

*\*Smelter v. S. Home Care Servs.*,
  904 F.3d 1276 (11th Cir. 2018) .................................. 22–24, 26–27

*William v. United Launch All., LLC*,
  286 F. Supp. 3d 1293 (N.D. Ala. 2018) ......................................... 31

*Vick v. Brennan*,
  172 F. Supp. 3d 285 (D.D.C. 2016) .............................................. 26

## Statutes and Rules

42 U.S.C. § 2000e-2 ..................................................................... 34–35

## <u>Statement Regarding Jurisdiction</u>

Ms. Harris sued Public Health Trust in the United States District Court for the Southern District of Florida on December 26, 2019, seeking damages for employment discrimination under the Florida Civil Rights Act of 1992 and Title VII of the Civil Rights Act of 1964, as amended. DE #1. The district court had jurisdiction under 42 U.S.C. § 2000e-5, 28 U.S.C. § 1331, 28 U.S.C. § 1343, and 28 U.S.C. § 1367. The district court granted Public Health Trust's motion for summary judgment on February 27, 2021, and Ms. Harris filed a timely notice of appeal with this Court. DE #49, 51. This Court has jurisdiction over this appeal under 28 U.S.C. § 1291.

## Statement of the Issues

Ms. Harris is a nurse who sued Public Health Trust under Title VII and the Florida Civil Rights Act for disparate treatment, retaliation, and a hostile work environment. Her case presents three questions:

1. Ms. Harris's direct supervisor told her that "[B]lacks are lazy, and don't like to work" before Ms. Harris told the supervisor that she is Black. Ms. Harris alleges that over the next fourteen months following this exchange, the supervisor restricted Mr. Harris's access to the supply closet, followed her during work hours, and initiated each of her disciplinary actions. Is the supervisor's racist statement direct evidence of discrimination?

2. Ms. Harris alleged that she faced discrimination at both of the Public Health Trust facilities where she worked, dating back to 2012. The district court only considered evidence concerning events from December 8, 2015, onward in its hostile work environment analysis because it determined that all prior evidence was time-barred. Was the district court wrong to exclude that evidence, and when all of Ms. Harris's evidence is considered, could a reasonable juror find that she endured a hostile work environment?

3. Ms. Harris alleges that after she complained about race discrimination, Public Health Trust retaliated against her with write-ups, suspensions, and, ultimately,

termination. Did she submit evidence showing that she did, in fact, complain about discrimination, and did she have an objectively reasonable belief that Public Health Trust retaliated against her for complaining?

### Statement of the Case

Ms. Harris is a Black woman who was a Licensed Practical Nurse 2 (LPN) for Public Health Trust. DE #43 at 2–3; DE #32-26 at 2. Public Health Trust operates Jackson North Medical Center and Jefferson Reeves Senior Health Center. DE #31 at 3. Ms. Harris worked at Jackson North from 2006 until she was transferred to Jefferson Reeves in 2014. DE #43 at 3; DE #32-5 at 2–4. She continued working at Jefferson Reeves until she was terminated in December 2016. DE #32 at 9.

During her time at Jackson North, Ms. Harris reported to Susan Zembal. DE #32 at 3. In November 2013, Ms. Zembal issued a Discipline Action Report (DAR) to Ms. Harris for allegedly making "inappropriate comments" and giving "inconsiderate responses to patient family needs." DE #32 at 3. But at a meeting regarding this DAR, Ms. Harris told the Human Resources Department, the Chief Operating Officer, and her union representative that Ms. Zembal racially profiled Black employees and that her DAR was a result of that profiling. DE #32-5 at 10–13. She then filed a charge with the Equal Employment Opportunity Commission (EEOC) alleging the same. *Id.* at 10–11. In particular, Ms. Harris alleged that Ms. Zembal followed the Black

employees around the Emergency Department and required Black employees to "sign in [and] out" whenever they used the restroom. *Id.* at 11. On February 10, 2014, a written reprimand was entered on Ms. Harris's record in connection with this DAR. *Id.* at 11, 122. After that reprimand, Ms. Harris spoke again with the Chief Operating Officer and notified her that Ms. Zembal had been forced to leave a prior job because "she had attacked" another staff member there. *Id.* at 12. In response, the Chief Operating Officer told Ms. Harris to return to work, and nothing came of either complaint regarding Ms. Zembal. *Id.*

Ms. Harris transferred to Jefferson Reeves in March 2014. DE #32 at 3–4. There, she answered to Roselyn Lys, Gianella Carreno, Rachel Freeman, and Caridad Nieves. *Id.* at 4–5. Under their supervision, Ms. Harris alleges that Black nurses were under more stress, faced more intense demands from superiors, and were disciplined for being late more often than other nurses. DE #42-5; DE #32-5 at 24. For example, she alleges that without providing any reason or explanation, superiors micromanaged her work activities, restricted her access to the supply closet, required her to seek access from co-workers in lower-level positions, and made her perform burdensome clerical duties, despite not requiring the same of other non-Black employees. DE #32-26 at 2; DE #32-5 at 36 (Ms. Harris noting that she had to ask a medical assistant for access to the supply closet); DE #32-7 (explaining that LPNs oversee medical assistants); DE #19

at 4 (describing "pretextual discipline" and "physical intimidation in the form of being followed"); *id.* (explaining that she was required to undertake additional work because she is Black). In short, she alleges that supervisors at Jefferson Reeves "restricted [her] from performing normal duties." DE #32-26 at 2; *see also* DE #42-5 (containing a declaration from Tamara Mells, a Black co-worker at Jefferson Reeves, who agreed with Ms. Harris's allegations of race discrimination, declaring that she, too, was "constantly harassed" and "disciplined for foolishness," and that Ms. Harris faced "untrue, absurd, and baseless accusations, and then [was] wrongfully disciplined").

More precisely, most of Ms. Harris's allegations regarding her treatment at Jefferson Reeves center around Ms. Carreno, who joined Jefferson Reeves as one of Ms. Harris's supervisors in March 2015. DE #32 at 5. Ms. Carreno initially believed that Ms. Harris was of Hispanic descent because Ms. Harris speaks fluent Spanish. DE #32-5 at 19, 25; DE #43 at 4. About six months after Ms. Carreno joined Jefferson Reeves, she told Ms. Harris, "[B]lacks are lazy, and don't like to work." DE #32-5 at 19–20; DE #43 at 4. She also told Ms. Harris that she would "not hir[e] any" Black nurses. DE #32-5 at 19. Ms. Harris replied that she herself is Black. *Id.* at 19, 25; DE #43 at 4. After that, Ms. Harris claims that Ms. Carreno began to target her "[c]ontinuously" throughout the remainder of her time at Jefferson Reeves. DE #32-5 at 33, 35–36 (explaining that Ms. Carreno followed Ms. Harris around the hospital

and restricted her access to the supply room); DE #43 at 4; *see also* DE #32-5 at 25 ("I informed her that I was [a] . . . black American[,] and she said, no . . . you're Spanish. . . . [S]hortly after that her whole demeanor changed, and she became more hostile towards me. She wanted me all the time. . . . Her body language, her facial expressions when she would talk to me [changed].").

Shortly after Ms. Carreno stated that "Blacks are lazy" and that she would "not hir[e] any" Black nurses, Ms. Harris notified Ms. Freeman and a union representative. DE #32-5 at 20–22. She also, in February 2016, contacted Jackson Health Services Attorney Cecilia Gonzalez, informing her about Ms. Carreno's racist comments and about being followed by Ms. Carreno. *Id.* at 22–23. But Ms. Harris alleges that no one she contacted took any action. *Id.* at 22; *see also* DE #32-26 at 2 (noting that Ms. Freeman eventually "instructed [Ms. Harris] to stop sending emails complaining of discrimination"); DE #32-5 at 23 (explaining that Ms. Gonzalez had no answer when Ms. Harris asked why no one was investigating Ms. Carreno).

Ms. Harris alleges that after this, she was disciplined in response to reporting Ms. Carreno's behavior. In January 2016, for example, Ms. Lys issued Ms. Harris a DAR claiming that Ms. Harris was tardy, and Ms. Freeman then issued Ms. Harris a written reprimand concerning her alleged tardiness. DE #32 at 6. In June 2016, Ms. Lys issued Ms. Harris another DAR, stating that she was absent three times. *Id.* Ms.

Freeman then suspended Ms. Harris for three days. *Id.* at 6–7. In August 2016, Ms. Freeman issued Ms. Harris a DAR citing various reasons, including offensive conduct towards patients, and Ms. Nieves then issued Ms. Harris a five-day suspension. *Id.* at 7. In November 2016, Ms. Freeman placed Ms. Harris on administrative leave for alleged insubordination and inappropriate comments. *Id.* at 7–8. In total, Ms. Harris received over a half dozen write-ups and suspensions in 2016, when she had received no disciplinary actions the year before. *Id.* at 5–6; DE #32-15 at 37; DE #32-29 at 4.

Ms. Harris maintains that each of these instances was an example of retaliation for her prior race discrimination complaints. DE #42 at 4–6; *see also* DE #32-15 at 24 (Ms. Harris stating in her rebuttal to the August DAR, "I have endured more than I can possibly take. I have asked to be transferred to [escape this] intentional malice . . . ."). For example, Ms. Harris claims that Gino Mayorga, a medical assistant at Jefferson Reeves, told her that Ms. Carreno had called him in 2016 to ask if he had any information about or pictures of Ms. Harris, saying that she "wanted [Ms. Harris] out." DE #32-5 at 31–32. Similarly, whenever Ms. Harris asked her co-workers why she was being treated unfairly, they told her, "Go talk to Gia [Carreno]." *Id.* at 32. Also, in later meetings with Ms. Freeman, Ms. Harris learned that Ms. Carreno had instructed Ms. Lys to write up Ms. Harris and that Ms. Carreno had told Ms. Freeman

to have Ms. Harris escorted off the premises when Ms. Harris was suspended. *Id.* at 21, 27.

On December 8, 2016, Ms. Harris filed a claim with the EEOC for discrimination and retaliation. DE #32-26 at 2. The next day, on December 9, 2016, Ms. Harris and union representatives met with Ms. Nieves about Ms. Harris's discipline. DE #32 at 9; DE #32-5 at 24–25. In this meeting, Ms. Harris again reported Ms. Carreno's racist behavior and alleged that these disciplinary actions were retaliatory and motivated by animus, but Ms. Nieves defended Ms. Carreno, saying that she knew Ms. Carreno well and did not believe her to be "that kind of person." DE #32-5 at 25.

On December 21, 2016, in response to the latest disciplinary action and a report from Ms. Freeman, Ms. Nieves terminated Ms. Harris's employment, stating that she had violated workplace policies and had already surpassed each lesser form of discipline. DE #32-29; DE #32 at 9; DE #32-2 at 3. Ms. Harris then added wrongful termination to her EEOC claim, arguing that she "was terminated in retaliation for" reporting race discrimination perpetrated against her. DE #32-31 at 2. Ms. Harris unsuccessfully challenged her termination at a grievance hearing with union representatives in February 2017. DE #32 at 9–10.

The EEOC issued Ms. Harris a notice of right to sue on September 27, 2019. DE #19 at 3; *see also* DE #32-33 (finding, in a Letter of Determination from the EEOC issued on April 11, 2019, that Ms. Harris had presented the EEOC with enough evidence to "establish[] Reasonable Cause to believe that [Public Health Trust] discriminated against [Ms. Harris] as alleged"). Ms. Harris filed her initial complaint on December 26, 2019, alleging violations of Title VII of the Civil Rights Act of 1964 and the Florida Civil Rights Act of 1992. DE #1. In February 2021, the district court granted Public Health Trust's motion for summary judgment, finding that there was no genuine issue of material fact. DE #49. Ms. Harris timely appealed to this Court.

## Standard of Review

This Court reviews the district court's grant of summary judgment de novo. *See Davis v. Legal Servs. Ala., Inc.*, 19 F.4th 1261, 1265 (11th Cir. 2021) (per curiam) (explaining that the movant bears the burden to show that "no genuine dispute" of material fact exists and that "courts must view the evidence in the light most favorable to the non-movant" in determining whether the movant has satisfied that burden (citing *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1263–64 (11th Cir. 2010))).

## Summary of the Argument

Ms. Harris, a Black woman, worked for Public Health Trust from December 2006–December 2016. Throughout her time there, she faced pervasive discrimination

because of her race. For example, her supervisor told her that "[B]lacks are lazy, and don't like to work," and Ms. Harris had to continue working under that supervisor for the next fourteen months without the supervisor being disciplined. Meanwhile, Ms. Harris repeatedly faced disciplinary actions after reporting the supervisor's behavior, and the supervisor both revoked Ms. Harris's access to the supply closet and asked a co-worker for pictures or information that might get Ms. Harris fired. Together, Ms. Harris's evidence of race discrimination at Public Health Trust supported her claims of disparate treatment, hostile work environment, and retaliation. Nonetheless, the district court granted summary judgment to Public Health Trust. For the following reasons, this Court should reverse.

## I.    Ms. Harris presented direct evidence of discrimination.

Summary judgment is not appropriate when the non-movant presents direct evidence of discrimination. In this case, Ms. Harris presented direct evidence in the form of her direct supervisor Ms. Carreno's statement that "[B]lacks are lazy, and don't like to work"—a remark that Public Health Trust never disputed. This statement reflects Ms. Carreno's discriminatory attitude towards an entire class of workers without the need for any further context, inference, or presumption.

This statement, coupled with the multiple adverse employment actions against Ms. Harris, serves as direct evidence of disparate treatment in Public Health Trust

facilities. After Ms. Harris told Ms. Carreno that she is Black, a cycle of discriminatory actions began: Ms. Carreno micromanaged Ms. Harris, impeded her ability to fulfill her responsibilities, and sought to have Ms. Harris disciplined and removed from her position. In fact, Ms. Harris reported Ms. Carreno's behavior to supervisors multiple times, and after she began reporting she faced over a half dozen disciplinary actions in a single year, when she had faced none the year before. These negative consequences correlate to Ms. Carreno's racist statement, and taken together with the statement they are sufficient to create a genuine issue of material fact, making summary judgment inappropriate.

## II.    Public Health Trust created a hostile work environment.

The district court granted Public Health Trust summary judgment on Ms. Harris's hostile work environment claim, in part because it excluded evidence of events that occurred before December 8, 2015, finding that the evidence was time-barred and that Ms. Harris had not properly cited the material as "background evidence" for her claim. But she did, in fact, cite to events occurring before December 8, 2015, in her Response in Opposition to Defendant's Motion for Summary Judgment, and nothing requires that she use the precise term "background evidence" when referencing such events. Because these excluded events supported Ms. Harris's hostile work environment claim—namely, as early as 2012, she was followed around

her workplace by a supervisor because she is Black—the district court was wrong to exclude this evidence from its evaluation. In doing so, the district court failed to apply the requisite totality of the circumstances approach to hostile work environment claims.

To succeed on a hostile work environment claim, a plaintiff need only demonstrate that the discriminatory conduct was either sufficiently severe or sufficiently pervasive to create an abusive environment. A reasonable jury could find that both are true in this case. Specifically, after working at a Public Health Trust hospital where she alleges that she was followed by a supervisor who racially profiled Black nurses and treated them differently from other co-workers, Ms. Harris was transferred to another Public Health Trust facility where her supervisor told her, "[B]lacks are lazy, and don't like to work." When Ms. Harris told her new supervisor that she was Black, the supervisor began micromanaging her, asking another co-worker for information that could get her fired, restricting her access to the supply closet, instructing another co-worker to write her up, and disciplining her because, in the supervisor's view, "[B]lacks are lazy." This discrimination was pervasive and severe, and it unreasonably interfered with her Ms. Harris's job performance, making summary judgment for Public Health Trust improper.

11

III.  **Ms. Harris made a prima facie case of discriminatory retaliation and demonstrated that the nondiscriminatory reasons for discipline cited by Public Health Trust were pretext.**

Ms. Harris was punished for reporting the daily discrimination that she faced, supporting her claim for retaliation. Retaliation has three elements: (1) an employee engaged in protected activity (2) who suffered an adverse employment action (3) with a causal connection between the protected activity and adverse action.

First, Ms. Harris presented ample evidence that she complained of race discrimination, including evidence of meetings with her superiors and a Public Health Trust attorney. And she objectively believed that her complaints were a protected activity because she reasonably understood that she was reporting actionable discrimination. For example, Ms. Carreno's racist statements regarding Black nurses—including that she would not hire any Black nurses—were discriminatory practices that an employee should be free to report without fear of retaliation.

Second, it is undisputed that Ms. Harris suffered adverse employment actions, including write-ups, suspensions, and termination. In particular, in 2016, after she reported Ms. Carreno, she was written up and suspended over a half dozen times, when she had not been disciplined at all the year before.

Finally, Ms. Harris's disciplinary actions were connected to her race discrimination complaints because they were in close temporal proximity and driven

12

by the person who was the subject of the complaints. Specifically, Ms. Harris reported Ms. Carreno's racist statements shortly after Ms. Carreno made them in the fall of 2015, and she continued to notify her superiors about Ms. Carreno's behavior throughout 2016. During that year, Ms. Harris faced a sharp increase in workplace discipline, and she alleges that Ms. Carreno orchestrated the increase. For example, she testified that whenever she asked her co-workers why she was being singled out for punishment, they all directed her to talk to Ms. Carreno. Additionally, she testified that Ms. Carreno instructed another co-worker to write her up and that Ms. Carreno called another co-worker to ask for pictures or information on Ms. Harris in an effort to get her fired. In fact, a Black co-worker corroborated Ms. Harris's claims and discussed the discriminatory treatment that they both faced, including unfounded allegations of wrongdoing and increased pressure and stress placed on Black nurses. With that evidence, Ms. Harris has created a genuine issue of material fact over whether the adverse employment actions that she suffered were connected to her protected activity of reporting unlawful discrimination, and not to the pretextual reasons that Public Health Trust presents.

## Argument

Ms. Harris is a Black nurse who worked for two Public Health Trust hospitals for a total of ten years, during which time she faced severe and pervasive race discrimination. For example, her supervisor at the second hospital, Ms. Carreno, told her that "[B]lacks are lazy, and don't like to work" before realizing that she is Black. Ms. Harris reported the comment, but Ms. Carreno was never disciplined, and Ms. Harris had to continue working under her for the next fourteen months. Over that time, Ms. Harris alleges that Ms. Carreno began following her around the workplace, denying her access to the supply closet, asking a co-worker for pictures or information to get her fired, and instructing another supervisor to write her up—all of which led to a sharp increase in her workplace discipline.

Ms. Harris sued Public Health Trust in 2019, alleging disparate treatment, hostile work environment, and retaliation, but the district court granted Public Health Trust's motion for summary judgment on each of the claims. This Court should reverse for three reasons. First, Ms. Harris presented direct evidence of discrimination that is sufficient to create a genuine issue of material fact on her disparate treatment claim. Second, the district court wrongly excluded evidence that it deemed time-barred, which, if examined, supports Ms. Harris's already credible claim for hostile work environment. And finally, Ms. Harris made a prima facie showing of retaliation with

14

evidence that she received multiple disciplinary actions in response to her complaints of race discrimination, and she successfully rebutted Public Health Trust's nondiscriminatory reasons for these actions, revealing that each was just pretext.

I. **Ms. Harris presented direct evidence of discrimination, making summary judgment on her disparate treatment claim inappropriate.**

Ms. Harris and Ms. Carreno had an amicable working relationship during the first six months they worked together. DE #32-5 at 19 ("Initially [Ms. Carreno] was kind because she was under the impression that I was Hispanic . . . ."). Then, not realizing that Ms. Harris is Black because she speaks fluent Spanish, Ms. Carreno told her that "[B]lacks are lazy, and don't like to work." *Id.* at 19–20. When Ms. Harris told Ms. Carreno her race, Ms. Carreno's attitude changed, and she began to treat Ms. Harris with hostility: micromanaging her, limiting her access to needed supplies, complaining about her performance, asking a co-worker for pictures or other information that could get her fired, instructing a separate co-worker to write her up, and otherwise harassing and belittling her. *Id.* at 21, 26, 32; DE #43 at 5; DE #19 at 6–7. A little over a year later, Ms. Harris had received multiple disciplinary actions, placement on administrative leave, and, ultimately, a termination notice—all of which she blames on Ms. Carreno's racist views. DE #32 at 6–8. The district court nevertheless found that Ms. Harris had not shown direct evidence of discrimination. DE #49 at 6–7. That finding was incorrect for two reasons.

15

First, the district court was wrong to say that Ms. Carreno's comment was "an isolated derogatory remark un-coupled from adverse employment actions" and thus "too attenuated" to constitute an adverse employment action.[1] *Id.* at 7 & n.3. Rather than constituting a single isolated incident, Ms. Carreno's statement marked the start of a cycle of discriminatory actions against Ms. Harris that correlated directly to Ms. Carreno's racist statement. In particular, after Ms. Carreno realized her race, Ms. Carreno denied her access to a medical supply room that she needed to perform her duties, closely followed her around the clinic, asked a co-worker for pictures or information that could get her fired, instructed another supervisor to write her up, and, generally, "wanted her out." DE #32-5 at 21, 23, 31; DE #19 at 13; DE #43 at 3–4. These experiences reflect the actions a supervisor who believed that Ms. Harris's work was inferior or "lazy" simply because of her race, and they resulted in Ms. Harris receiving over a half dozen write-ups and suspensions in 2016, when she had received no disciplinary actions the year before. DE #32-15 at 37; DE #32 at 5–6. In short,

---

[1] The district court stated that Ms. Harris did not respond to Public Health Trust's argument that Ms. Carreno's remark "was not repeated and was completely irrelevant to any of Plaintiff's DARs, suspensions, or termination." DE #49 at 6–7. That's not correct. Ms. Harris argued that Ms. Carreno's remark was one of many discriminatory actions she experienced due to her race. DE #43 at 3–5. Also, Ms. Harris argued that she received her disciplinary actions because Ms. Carreno learned her race and because she complained about Ms. Carreno's racist behavior. *Id.*; DE #32-5 at 19–21, 28; DE #42 at 4–6.

16

because Ms. Harris experienced continual adverse treatment from the moment Ms. Carreno learned she was Black, and because the discrimination she experienced correlates directly with Ms. Carreno's racist statements, Ms. Carreno's statements were neither isolated nor too attenuated to constitute direct evidence. *See Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir. 1997) ("[T]his Court has found direct evidence where 'actions or statements of an employer reflect[] a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee.'" (second alteration in original) (quoting *Caban-Wheeler v. Elsea*, 904 F.2d 1549, 1555 (11th Cir. 1990) *abrogated on other grounds by St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993))); *Miles v. M.N.C. Corp.*, 750 F.2d 867, 874–76 (11th Cir. 1985) (holding that the plaintiff presented direct evidence of discrimination where the plaintiff was not rehired after a temporary layoff and the plant manager stated he would not hire Blacks because "[h]alf of them weren't worth a shit").

Second, the district court erred in finding that Ms. Carreno's remarks were "too remote in time" from an adverse employment action to constitute direct evidence, because only four months passed between Ms. Carreno's racist statements and Ms. Harris's first adverse employment action, and because Ms. Harris endured continual hostile behavior in the time between these events. DE #49 at 7. In *Lindsey v. American*

*Cast Iron Pipe Co.*, for instance, this Court found that the plaintiff's testimony, if believed, would constitute direct evidence of discrimination where the alleged discriminatory statement occurred on October 1, 1979, and the plaintiff was passed over for promotion in the spring of 1981. 772 F.2d 799, 801–02 (11th Cir. 1985). A shorter amount of time passed between the discriminatory statement and the first adverse employment action in this case: Ms. Carreno made her racist statements in September 2015 and Ms. Harris was issued a DAR in January 2016. *Cf. Ross v. Rhodes Furniture, Inc.*, 146 F.3d 1286, 1288, 1291 (11th Cir. 1998) (finding the passing of three years between a racist remark and the plaintiff's firing too attenuated to constitute direct evidence). Ms. Carreno's remark was thus both close in time and sufficiently temporally connected by her continued harassment of Ms. Harris to support Ms. Harris's disparate treatment claim.[2]

## II. Public Health Trust created a hostile work environment, as shown in part by the background evidence that the district court did not consider.

Ms. Harris contends that she was subjected to a hostile work environment at both Public Health Trust facilities—Jackson North and Jefferson Reeves. At Jackson North, for example, she alleges that she was followed around the workplace, because of her race, by a supervisor who had previously attacked a subordinate at another

---

[2] Ms. Harris is not challenging the district court's finding that Ms. Harris did not adequately present evidence of a comparator employee.

18

hospital. DE #32-5 at 10, 14, 37, 45–46. Then, during her time at Jefferson Reeves, Ms. Harris's supervisor told her that "[B]lacks are lazy, and don't like to work" before restricting her access to the supply closet, micromanaging her, asking a co-worker for damaging pictures or information, and instructing another co-worker to write her up, all of which restricted her from doing her job. DE #19 at 6–7; DE #43 at 4; DE #32-5 at 20–25, 31, 35.

Even though this combined evidence demonstrates Public Health Trust's persistent hostile work environment across its facilities, the district court found that Ms. Harris could not establish a prima facie case for her hostile work environment claim. In doing so, though, the court made two errors. First, it incorrectly determined that it need not consider the pre-December 8, 2015 Jackson North events as background evidence to Ms. Harris's hostile work environment claim. DE #49 at 15. That failure prevented the district court from correctly applying the totality of the circumstances approach. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999) (en banc) ("The courts should examine the conduct in context, not as isolated acts, and determine [the severity and pervasiveness of the harassment] under the totality of the circumstances."). Second, with or without that background evidence, the district court wrongly found that Ms. Harris failed to establish a prima facie case for hostile work environment discrimination. DE #49 at 16.

19

**A. Ms. Harris referenced time-barred events as background evidence to support her hostile work environment claim, and the district court should have considered those facts.**

There are two reasons why the district court was wrong to ignore the pre-December 8, 2015 Jackson North events: (1) Ms. Harris relied on those events as background evidence; and (2) Ms. Harris was not required to use the magic words "background evidence" before the district court could consider the allegations as such.

As to the first point, the district court found that "Plaintiff does not reference any incidents that took place prior to December 8, 2015 in her Response." DE #49 at 15. But that's not right, because after urging the district court to "consider the totality of the circumstances," Ms. Harris's Response cited to events that occurred at Jackson North prior to December 8, 2015. *Compare* DE #43 at 17 (citing "ECF 32-5, at . . . 209:22–212:19 . . . 218:17–231:24") *with* DE #32-5 at 210:23–211:3 (testifying that she had made "complaints regarding race discrimination" at Jackson North). So, despite the district court concluding otherwise, Ms. Harris did "reference . . . incidents that took place prior to December 8, 2015 in her Response." DE #49 at 15. And the district court's failure to review that background evidence affected Ms. Harris's ability to carry her burden because it directly contributed to the severity and pervasiveness of the harassment she endured.

Second, the district court excluded the Jackson North events after stating that Ms. Harris did not specifically characterize them as "background." DE #49 at 15 ("Plaintiff does not argue that the discrimination she claims to have faced at Jackson North prior to December 8, 2015, is background . . . . Accordingly, the Court does not consider [those] incidents. . . ."). But neither the Supreme Court nor this Court have ever required a plaintiff to specifically characterize time-barred events as background evidence before the evidence may be considered. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) (explaining that a court may consider all time-barred events that support a timely claim if it determines that the complaints are a part of the same actionable hostile work environment practice); *Moore v. San Carlos Park Fire Prot. & Rescue*, 808 F. App'x 789, 797 (11th Cir. 2020) (asking whether the time-barred claims and the timely claims were "sufficiently related so that they may fairly be considered part of the same hostile work environment claim") (cleaned up); *see also Menefee v. Montgomery Cnty. Bd. of Educ.*, 137 F. App'x 232, 233 (11th Cir. 2005) ("[I]t does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period.") (quoting *Morgan*,

21

536 U.S. at 117)). In short, all evidence related to a properly charged act should be considered; no magic words are necessary.[3]

**B. Under the totality of the circumstances analysis, a reasonable juror could find that Ms. Harris endured severe or pervasive harassment.**

The district court agreed with Public Health Trust "that the instances of discrimination that [Ms. Harris] has set forth are too sporadic to establish a severe and pervasive level of discrimination." DE #49 at 15–16 ("[T]here is no genuine dispute of material fact as to whether any harassment Plaintiff faced was so severe and pervasive that a reasonable person would have found that the terms and conditions of her employment had been altered."). We respectfully ask this Court to reverse that decision.

This Court considers four factors when evaluating the severe or pervasive element, asking if it the work environment was objectively hostile based on "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Smelter v.*

---

[3] To the extent that the district court created this new requirement, it applied it inconsistently by considering the pre-December 8, 2015 statement "Blacks are lazy" when that event was not plead as "background" evidence.

*S. Home Care Servs.*, 904 F.3d 1276, 1285 (11th Cir. 2018) (citations and internal quotations omitted). Of the four, "no single factor is required," *Harris v. Forklift Sys.*, 510 U.S. 17, 23 (1993), and "[e]ither severity or pervasiveness is sufficient to establish a violation." *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 808 (11th Cir. 2010). Here, when considering all four factors, a reasonable juror could find that the harassment Ms. Harris endured was severe or pervasive enough to alter the terms of her employment. Because of that, summary judgment was inappropriate.

### 1. Ms. Harris was harassed daily by her direct supervisor, who believed that "Blacks are lazy."

Beginning with the frequency factor, Ms. Harris alleges that she was followed every day for three years—because she is Black—by two supervisors at Jackson North and Jefferson Reeves. *See* DE #32-5 at 23 (explaining that she reported being followed whenever it occurred, which was "a daily occurrence"); *id.* at 24 (explaining that she felt harassed because of "what [she] experienced daily"); *see also* DE #19 at 6–7; DE #43 at 4, 17. She also alleges that while she was at Jefferson Reeves, she was "denied access to supplies to perform [her] daily functions as a nurse" just because she is Black. DE #32-5 at 35.

Being followed and denied supplies at Jefferson Reeves cannot be extricated from the racist statement made by Ms. Carreno. Indeed, by following Ms. Harris, Ms. Carreno was physically manifesting her distrust and dislike of Black people—feelings

that she stated overtly to Ms. Harris. That being the case, the daily following was suffused with racial animus, and when Ms. Harris saw Ms. Carreno following her—everyday—she perceived it as racial harassment, as any reasonable juror would. So the frequency factor weighs in favor of finding that Ms. Harris endured severe or pervasive harassment. *Dees v. Johnson Controls World Servs.*, 168 F.3d 417, 418 (11th Cir. 1999) (reversing a grant of summary judgment where the plaintiff alleged "almost-daily abuse"); *Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 509 (11th Cir. 2000) (holding that "roughly fifteen separate instances of harassment over the course of four months" was pervasive).

### 2. A reasonable person could find that a supervisor making a racist statement and conspiring to get an employee fired was severe harassment.

When evaluating the severity element, the district court failed to give adequate weight to Ms. Carreno's racist statement, and it ignored entirely Ms. Carreno's attempt to have Ms. Harris fired. That matters because a reasonable juror would find those actions severe.

First, the statement "[B]lacks are lazy" is both racist and severe. *See Smelter*, 904 F.3d at 1286 (noting that "[c]omments *like these* are sufficiently severe to create a hostile work environment," where one of the comments was "black men are 'lazy'" (emphasis added)); *see also Allen v. Mich. Dep't of Corr.*, 165 F.3d 405, 410–411 (6th Cir. 1999) (stating that a supervisor's remark that the African-American plaintiff was "lazy

24

like the rest of his people" "clearly constitute[s] racial harassment"). In fact, Ms. Carreno's statement is just as racist and therefore severe as the conduct in *Jones v. UPS Ground Freight*, where the defendant placed banana peels on the Black plaintiff's truck, but said nothing about them. 683 F.3d 1283, 1297 (11th Cir. 2012). There, this Court reversed summary judgment because the behavior "create[d] a genuine issue of triable fact." *Id.* at 1298 (recognizing the severity of referencing the stereotype that likens Black people to monkeys, even if it was only expressed implicitly). The result should be no different here, because the racist stereotype that Ms. Carreno expressed was just as severe, *and* it was expressed explicitly to Ms. Harris. That is enough to create a genuine issue of triable fact on the severe or pervasive element. *Id.*

Second, the district court never considered the fact that racist remarks can have a "profound psychological effect" on employees, *Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 673 (7th Cir. 1993), which matters because the severity factor should be analyzed from "the perspective of a reasonable person in the plaintiff's position"—which would be a Black woman. *Mendoza*, 195 F.3d at 1246. Instead of considering it from that perspective, the district court downplayed it, labeling it a "derogatory remark" that was not "repeated in sum or substance." DE #49 at 16. But that fails to consider how, even if stated just once, the statement would impact a Black woman like Ms. Harris, and it fails to identify the statement as what it is: racist, not derogatory. At

25

bottom, such a racist statement is severe, in the plain meaning of the word. *See Smelter*, 904 F.3d at 1286; *see also Jones*, 683 F.3d at 1298.

Finally, the district court did not consider Ms. Harris's allegation that Ms. Carreno called Ms. Harris's co-worker in an attempt to gather information that would justify firing her. *See* DE #49 (failing to mention this occurrence in any regard). Specifically, Ms. Harris alleges that Ms. Carreno called a co-worker to ask him if he "ha[d] any information" or "pictures" on Ms. Harris while also warning him to "be careful" because Ms. Carreno "wanted [Ms. Harris] out." DE #32-5 at 31–32. A reasonable juror would likely agree that a supervisor who sought to turn co-workers against an employee while scheming to get her fired has created a hostile work environment. *See Vick v. Brennan*, 172 F. Supp. 3d 285, 302 (D.D.C. 2016) (noting that allegations of "nefarious means by which [the defendant] attempted to orchestrate [the plaintiff's] termination also help state a claim for hostile work environment"). In sum, there is a genuine issue of triable fact because a reasonable juror could find this behavior severe and objectively hostile.

### 3. Ms. Harris endured both threatening and humiliating harassment.

Ms. Harris alleges that she was subjected to a racist statement, followed, micromanaged, and denied access to the supply closet. She endured this physically threatening and humiliating treatment for over three years.

26

To begin, this Court has acknowledged that racist statements are humiliating—finding that "[i]t was *surely humiliating* for [the plaintiff], a [B]lack woman, to hear a co-worker say that [B]lack people are 'the scum of the earth.'" *Smelter*, 904 F.3d at 1286. Likewise, here, it was humiliating for Ms. Harris to be told "[B]lacks are lazy" to her face.

Next, despite the district court opining to the contrary, being followed by co-workers around the workplace is threatening or humiliating. That is especially the case because Ms. Harris was not followed by a co-worker of similar rank, but by a superior. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 763 (1998) ("[A] supervisor's power and authority invests his or her harassing conduct with a *particular threatening character*." (emphasis added)). Also, Ms. Harris knew that the supervisor following her at Jackson North was previously fired for attacking co-workers. DE #32-5 at 12. Likewise, being followed at Jefferson Reeves was threatening and humiliating because Ms. Harris knew that the supervisor following her was openly racist. *Garret v. Tyco Fire Prods., LP*, 301 F. Supp. 3d 1099, 1120 (N.D. Ala. 2018) (recognizing how the seemingly innocuous action of flipping up the shield of the plaintiff's helmet could be physically intimidating when coupled with a racist statement).

To be sure, this Court has said that a defendant's "constant following" of a plaintiff was "neither threatening nor humiliating." *Mendoza*, 195 F.3d at 1249

27

(cleaned up). But in *Mendoza*, unlike here, the "following" never occurred "in the office part of the plant where [the plaintiff] worked." *Id.* at 1250 Similarly, this Court explained in *Mendoza* that the "following" in that case was not described "in an intimidating or threatening fashion." *Id.* Here, on the other hand, Ms. Harris specifically alleged that her employers "physically intimidated" her. DE #32-26 at 2. And that she "was traumatized." DE #32-5 at 43. So, taking Ms. Harris's allegations about being followed in her workplace in the most favorable light, she has shown that she endured threatening and humiliating behavior while working for Public Health Trust.

Finally, Ms. Harris's supervisors' "total[] disregard[]" of her complaints was humiliating, if not also threatening. *Id.* at 44. More specifically, at Jackson North, when Ms. Harris complained of race discrimination, she said: "They never responded. They would just look at me." *Id.* at 14. Then after complaining about Ms. Carreno, Ms. Freeman curtly told Ms. Harris to "go back to work," *id.* at 22, and Roberto Campos-Marquetti "just stood" looking at Ms. Harris with a "blank stare." *Id.* at 39. Being voiceless is threatening because if complaints are ignored and the perpetrators have ostensible immunity, one necessarily fears what they might do next. *See id.* at 163 ("I have no voice here . . . I have endured more than I can possibly take. I have asked to be transferred to be out of intentional malice. . . ."). In sum, the district court did not

adequately analyze whether Ms. Harris was subjected to threatening or humiliating harassment and this case should go to the jury.

### 4. The harassment unreasonably interfered with Ms. Harris's job performance and altered the terms and conditions of her employment.

Public Health Trust's harassment of Ms. Harris resulted in her termination. But even before that, the harassment made Ms. Harris's job more difficult, and that resulted in Ms. Harris effectively working a different job. In other words, the harassment was so severe and pervasive that it altered the terms and conditions of her employment.

To begin, the district court itself wrote that "the suspensions, write-ups, and terminations . . . *did* alter her employment." DE #49 at 16 (emphasis added). The only reason the court found that those adverse employment actions were inconsequential to the hostile work environment claim was because it found Public Heath Trust's non-discriminatory reasons satisfactory. But as explained below in Section III.C, the non-discriminatory reasons for those actions were pretextual. Thus, the harassment, resulting in the termination, did in fact alter the terms of Ms. Harris's employment. *See Burlington Indus.*, 524 U.S. at 753–54 ("When a plaintiff proves that a tangible employment action resulted from a . . . supervisor's [harassment], he or she establishes that the employment decision itself constitutes a change in the terms and conditions of employment that is actionable under Title VII.").

29

Even beyond those tangible employment decisions, though, the harassment that Ms. Harris endured "adversely altere[d] [her] job responsibilities and otherwise undermin[ed her] authority." *Bryant v. Jones*, 575 F.3d 1281, 1297 (11th Cir. 2009). It did so, for example, by stripping Ms. Harris of her autonomy and authority as an LPN, because as an LPN she was supposed to be responsible for "overseeing Medical Assistants." DE #42-5 at 2; *see also* DE #32-5 at 60 (testifying that the medical assistant position is not higher than an LPN position and that medical assistants cannot supervise LPNs). Yet, as a part of the harassment, Ms. Harris was forced to report to a Medical Assistant, Jennifer Murray, when she needed supplies. DE #32-5 at 36; *see also* DE #32-26 at 2 (alleging that she was "restricted to clerical duties" and "restricted from performing normal duties such as issuing medicine"). A reasonable jury could find that these restrictions altered the terms and conditions of Ms. Harris's employment. *See Bryant*, 575 F.3d at 1297 (finding altered employment terms and conditions when one of the plaintiffs was stripped of her hiring power, prevented from performing tasks that were "part of her job," and had "her responsibilities . . . curtailed").

Further, Ms. Harris believed that she was being followed by someone who believes that "[B]lacks are lazy." That being so, Ms. Harris was confronted daily by a woman she knew held racist opinions, and that would affect anyone's ability to work productively—especially if it required taking time away from work to report that person,

as it did in Ms. Harris's case. Thus, a reasonable juror could find that Public Health Trust's harassment interfered with Ms. Harris's performance. *Miller Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1277 (11th Cir. 2002) ("[H]arassment need not be shown to be so extreme that it produces tangible effects on job performance in order to be actionable."); *William v. United Launch All., LLC*, 286 F. Supp. 3d 1293, 1306 (N.D. Ala. 2018) ("Factors that demonstrate that conduct interfered with job performance include being unable to concentrate on work, shaking because of co-worker conduct, taking time away from work to complain to superiors and coworkers, and writing notes to keep a record of conduct."). As a result, this Court should reverse.

## III. Ms. Harris established a prima facie case for discriminatory retaliation, and she showed that Public Health Trust's nondiscriminatory explanations are pretext.

Ms. Harris alleges that she complained of race discrimination to the staff at Public Health Trust on numerous occasions. DE #43 at 18. She also alleges that in retaliation for her complaints, she was written up, suspended, and subsequently terminated. DE #43 at 18.

In order to establish a prima facie case for retaliation under Title VII, Ms. Harris must demonstrate that: "(1) that she engaged in statutorily protected expression; (2) that she suffered an adverse employment action; and (3) that there is some causal relation between the two events." *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1021

31

(11th Cir. 1994). As an initial matter, it is not disputed that Ms. Harris suffered adverse employment actions. That said, the district court made a number of findings regarding the first and third elements as it denied Ms. Harris's retaliation claim. As to the protected activity element, for example, the court asserted that Ms. Harris did not provide evidence that she reported Ms. Carreno's racist statement and that, even if she did, she lacked an objectively reasonable belief that what she complained of was race discrimination. DE #49 at 12. And with regard to the causal connection element, the court stated that Ms. Harris did not show that Ms. Nieves was aware of the EEOC complaint before terminating her and that she offered no persuasive evidence that she was denied access to the supply closet "on account of her race." DE #49 at 11, 13. We disagree with each of those findings.

### A. Ms. Harris had an objective belief that she was reporting actionable race discrimination, so her complaints were protected activities.

As an initial matter, the district court was wrong to state that Ms. Harris did not offer "evidence that would indicate she made the complaint, who she complained to, and what exactly she complained of." DE #49 at 12. Ms. Harris outlined that she complained to Ms. Freeman, Ms. Gonzalez, Ms. Nieves, and Mr. Campos-Marquetti. DE #32-5 at 20, 23, 25, 38–39. Also, in each of those instances, she noted specifically what she complained about. *Id.* at 20 (reporting "that Ms. Carreno said, 'blacks are lazy, and don't like to work'"); *id.* at 23 ("I told her how [Ms. Carreno] inappropriately

32

touched me . . . [and about] the comment that she made against blacks."); *id.* at 25 ("I explained to them . . . shortly after [the statement] . . . [Ms. Carreno] became more hostile towards me."); *id.* at 38–39 ("I went over everything.").

   The district court said that Ms. Harris only cited "portions of her deposition" as proof that she complained. DE #49 at 12. While that is true for her oral complaints during the alleged meetings, it is not for the written complaint that she made in response to a DAR where she complained of "intentional malice" that was "more than [she] c[ould] possibly take." DE #32-21 at 11. Also, it is not a significant or unsupported leap to acknowledge that Ms. Harris met and complained orally of race discrimination. In fact, Public Health Trust does not dispute Ms. Carreno's racist comment, nor does it dispute the numerous meetings that Ms. Harris alleged. Moreover, the written EEOC complaint that Ms. Harris filed on December 3, 2016—which raises the same issues that Ms. Harris says she complained of in the meetings—is record evidence. *See* DE #32-26 at 2. So, there is ample record evidence that supports Ms. Harris's allegations that she complained about race discrimination.

   Nevertheless, the district court found that even if Ms. Harris did report Ms. Carreno's statement, she lacked an objectively reasonable belief that what she complained of was race discrimination, and thus her reporting was not a protected activity. We disagree.

In evaluating protected activities, this Court considers both a subjective and objective component. *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1311 (11th Cir. 2016). Here, it is not disputed that Ms. Harris subjectively believed that Public Health Trust was engaging in discrimination. *See* DE #49 at 13 ("Plaintiff may have had a subjective belief that she was being unlawfully discriminated against when she complained to management. . . ."). So the only question is whether Ms. Harris held an "objectively reasonable" belief that the opposed conduct was "actually unlawful" under "controlling substantive law." *See Furcron*, 843 F.3d at 1311 (internal citations and quotations omitted). To answer that question, Ms. Harris need not prove the conduct was actually unlawful, but only that it is "close enough to support an objectively reasonable belief that it is." *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1351 (11th Cir. 1999). In other words, she just has to show that her complaints about Ms. Carreno were "close enough" to unlawful discrimination as to satisfy the objective component. She has done that here.

Ms. Harris complained of racism stemming from the statement "[B]lacks are lazy," and she also complained that Ms. Carreno said she would not hire Black applicants. DE #32-5 at 19 ("[S]he said . . . she's not hiring any [Blacks]."). The content of Ms. Harris's complaint, therefore, alleged unlawful employment practices. *See* 42 U.S.C. § 2000e-2(a)(1) (making it an unlawful employment practice to "refuse

to hire . . . any individual . . . because of such individual's race"). Because of that, Ms. Harris's complaints about those practices were protected activities. *See Furcron*, 843 F.3d at 1311 ("Title VII's protections . . . extend to those who voice informal complaints. . . .").

The district court erred in holding otherwise, relying almost entirely on a quote from a case that is distinguishable from the one at hand. DE #49 at 12 (stating that the objective criterion was not met because "not every uncalled for, ugly, racist statement by a co-worker is an unlawful employment practice" (quoting *Butler v. Ala. Dep't of Transp.*, 536 F.3d 1209, 1213 (11th Cir. 2008))). The district court was wrong to rely on *Butler* because, taken in its context, it does not support the district court's point. In fact, this Court explained exactly why the "uncalled for" and "ugly" statement in *Butler* was not an objectively unlawful employment practice. It was because the comment (1) "occurred away from work," (2) the incident "did not happen within the hearing of supervisors," (3) the comment was not "aimed at [the plaintiff]," (4) the plaintiff "never even suggested that this one-time use of vile language away from work created a hostile work environment," and (5) the comment "did not affect her ability to do her job." *Id.* None of these factors are present here: (1) Ms. Carreno made the statement at work, (2) Ms. Carreno was a supervisor, (3) the statement was spoken to

35

Ms. Harris, (4) Ms. Harris alleged and sufficiently showed that the statement contributed to a hostile work environment, and (5) the statement did affect Ms. Harris's job performance as described in the hostile work environment discussion.

What's more, if the standard for the objective component is simply that the content of Ms. Harris's allegations was "close enough" to unlawful employment practices, then the EEOC's evaluation of the facts should suffice. DE #32-33 at 3 ("The Commission concludes that the evidence obtained in the investigation establishes Reasonable Cause to believe that Respondent discriminated against the Charging Party as alleged."). At bottom, Ms. Harris's complaints contained allegations that were objectively unlawful—namely, discriminatory hiring practices and a hostile work environment. Because of that, this Court should reverse.

**B. Ms. Harris's disciplinary actions were causally connected to her various complaints about her direct supervisor's discrimination.**

This Court "construe[s] the causal link element broadly." *Chapter 7 Trustee v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1260 (11th Cir. 2012). Accordingly, the ultimate inquiry is simply whether "the protected activity and the adverse action were not wholly unrelated." *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999). To that end, this Court asks (1) whether the "decision-maker became aware of the protected conduct," and (2) whether "there was close temporal proximity between this awareness and the adverse employment action." *Id.*

With that standard in mind, a reasonable juror viewing the events in this case would not find that there was absolutely no relation *at all* between Ms. Harris's protected activities and the subsequent adverse employment actions—especially taking into account the hostile work environment that her supervisors created. Given the broad construction of this element, that should be enough for this Court to find that the DARs, three-day suspension, leave of absence, and subsequent termination are causally connected to at least one of Ms. Harris's complaints.

### 1. January 2016, June 2016, and August 2016 DARs.

To start, Ms. Carreno directed Ms. Lys to issue Ms. Harris three separate DARs in January, June, and August 2016, and that made Ms. Carreno a "decisionmaker" for the purposes of this analysis. *See* DE #32-5 at 31 (noting that Ms. Lys was "being directed . . . by Ms. Carreno"); *see also Anterio v. City of High Springs Fla.*, 762 F. App'x 891, 899 (11th Cir. 2019) (explaining that "causation may be established, under the 'cat's paw' doctrine, when a decisionmaker followed a biased recommendation from a non-decisionmaker without independently investigating the complaint").

As to awareness of Ms. Harris's protected activity, it is reasonable to infer that, shortly after the incident, Ms. Carreno was told by her supervisors that a co-worker accused her of making a flagrantly racist comment. Otherwise, that would mean Public Health Trust made no attempt to investigate Ms. Harris's allegation. *See Clover*, 176

37

F.3d at 1354 ("The defendant's awareness of the protected statement, however, may be established by circumstantial evidence."); *see also Jacomb v. BBVA Compass Bank*, 791 F. App'x 120, 124 (11th Cir. 2019) (finding that even without direct evidence, it was "plausible that a relatively high-level manager would know about an EEOC charge filed by one of the employees he supervises"). Moreover, Ms. Carreno was at least made aware of Ms. Harris's complaint by February 2016 when Ms. Gonzalez, the Public Health Trust lawyer, told Ms. Harris that she had relayed Ms. Harris's complaint to Ms. Carreno. DE #32-5 at 20–23 (Ms. Harris stating that the Public Health Trust lawyer told her that she "has talked to Gianella" about Ms. Harris's concerns). So Ms. Carreno knew about Ms. Harris's complaints soon after Ms. Harris began making them, which matters because her knowledge was temporally proximate to the numerous DARs she directed.

First, as to the January 2016 DAR, only four months separated the DAR from Ms. Carreno's presumed knowledge of Ms. Harris initially reporting Ms. Carreno's racist comment. And with regard to the June and August DARs, four and six months respectively separate those adverse employment actions from February 2016, which was when Ms. Gonzalez told Ms. Harris that she had spoken with Ms. Carreno about Ms. Harris's complaint. Four and six months exhibit a stronger temporal proximity than the timeframe in *Gupta* where this Court held that complaints in late 1994 and

38

early 1995 were temporally proximate to adverse employment actions taken in the spring of 1996 and in early 1997. *Gupta v. Fla Bd. of Regents*, 212 F.3d 571, 590 (11th Cir. 2000) *overruled on other grounds by Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). In short, this Court has found that over a year can constitute temporal proximity, and the gaps here were shorter than that.

To be sure, when a plaintiff alleges temporal proximity *alone*, this Court has required "very close" temporal proximity. *See e.g., Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1182 (11th Cir. 2010) (finding that three months, without more, is insufficient). *But see Gilliam v. U.S. Dep't of Veterans Affairs*, 822 F. App'x 985, 993 (11th Cir. 2020) (Martin, J., concurring) (explaining that *Brown* and similar cases "do not stand for the proposition that a three-month gap can never be 'close enough'"). But unlike cases that require "very close" temporal proximity, it cannot be said that Ms. Harris offered no other "evidence tending to show causation" or that she "offered nothing at all" to connect her complaints to the adverse employment actions. *Brown*, 597 F.3d at 1182–83. For instance, Ms. Harris testified that Ms. Carreno was looking for ways to get rid of her, and that Ms. Carreno's tactics included the manipulation of Ms. Harris's co-workers. *See* DE #32-5 at 31–32 (describing Ms. Carreno's voicemail to Gino Mayorga, where she expressed a desire for damaging information about Ms. Harris). Also, any time Ms. Harris wanted an explanation for why she was being

treated differently than others, her co-workers told her to "[g]o talk to Gia [Carreno]." *Id.* In sum, this additional evidence, coupled with temporal proximity, is sufficient to show that the DARs were not wholly unrelated to Ms. Harris's complaints.

### 2. Three-Day Suspension.

Ms. Harris reported Ms. Carreno's racist comment to Ms. Freeman in a September 2015 meeting. DE #32-5 at 20 (explaining that she spoke with Freeman "[s]hortly after" the incident). But she also reported the incident in February of 2016 when she spoke to the Public Health Trust lawyer, Ms. Gonzalez. DE #32-5 at 23.

Ms. Harris was then suspended for three days on August 9, 2016, and the decisionmakers in that suspension, Ms. Freeman and Ms. Carreno, knew of Ms. Harris's prior complaints. As mentioned above, Ms. Carreno knew of the complaint against her as early as September 2015 and no later than February 2016. And Ms. Freeman knew in September 2015 because Ms. Harris told her about the incident. This matters because according to Ms. Harris, the three-day suspension was executed by Ms. Freeman at "the direction of Gianella Carreno." DE #32-5 at 26; *see Anterio*, 762 F. App'x at 899.

With the decisionmaker's knowledge established, the temporal proximity prong remains. And given that the three-day suspension was in "close temporal proximity" to both of Ms. Harris's complaints, the events are not wholly unrelated. In fact, the

suspension occurred less than a year from the initial complaint and only six months after the second complaint to Ms. Gonzalez. *See Gupta*, 212 F.3d at 589–90 (finding that over a year was temporally proximate).

And as mentioned above, temporal proximity does not represent the entirety of the causal connection. Ms. Harris alleged that Ms. Carreno made an outwardly racist statement while also creating a hostile work environment. *See* DE #32-5 at 25 (stating that "shortly after [finding out that Ms. Harris was Black and not Hispanic, Ms. Carreno's] whole demeanor changed, and she became more hostile towards me. . . [h]er body language, her facial expressions when she would talk to me"). So, the cases where this Court has required a "very close" temporal proximity do not apply here because Ms. Harris alleged more than temporal proximity alone; she presented further evidence that connected her complaint to her three-day suspension.

### 3. Administrative Leave.

On September 6, 2016, Ms. Harris—in a rebuttal to a DAR issued by Ms. Freeman and signed by Ms. Carreno—complained of "intentional malice" and that she had "endured more than [she] c[ould] possibly take" while emphasizing that she "ha[d] no voice" in her workplace. DE #32-21 at 11. Ms. Freeman placed Ms. Harris on administrative leave a little over two months after that complaint, citing alleged insubordination. DE #32-24 at 2; DE #32-2 at 3 ("On November 15, 2016, I [Ms. Freeman]

41

placed Harris on administrative leave for disruptive behavior."). Two months is suffi-cient temporal proximity. *See Gupta*, 212 F.3d at 589–90; *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1154 (11th Cir. 2020) (Wilson, J., concurring in part and dissenting in part) (asserting that two months "is surely close enough that a fact finder could infer retaliation").

### 4. Termination.

The district court found that Ms. Nieves did not know about Ms. Harris's EEOC complaint when she terminated her; but even if that was the case, Ms. Nieves had knowledge of Ms. Harris's internal complaints to her supervisors. Which is to say, Ms. Nieves had knowledge of a protected activity regardless of whether Ms. Nieves knew about the EEOC complaint.

Ms. Harris met with Ms. Nieves prior to her termination and voiced her com-plaints of race discrimination in that meeting. DE #32-5 at 25; DE #32-15 at 3 (Ms. Nieves stating that "I met with Ms. Harris"). In fact, Ms. Harris said that Ms. Nieves defended Ms. Carreno in that meeting by stating "I know her" and "[s]he's not that kind of person." DE #32-5 at 25. This is contrary to Ms. Nieves's declaration in which she claims to not only have had no knowledge of the EEOC charge, but also that she "was not aware of any complaint of race or national origin discrimination made by Harris to JMH management." DE #32-15 at 3. That conflict presented an issue of fact

that should have prevented summary judgment, because viewing Ms. Harris's version in the most favorable light, the knowledge component is met.

This meeting between Ms. Nieves and Ms. Harris was on December 9, 2016, so the December 21, 2016 termination occurred less than a month after Ms. Harris's complaints during that meeting. DE #32 at 9. Therefore, the causal connection element is satisfied because both the knowledge prong and the temporal proximity prong were met. *Farley*, 197 F.3d at 1337 (holding that "seven weeks" was "sufficiently proximate to create a causal nexus for the purposes of establishing a prima facie case").

At bottom, Ms. Harris established causal connections between numerous adverse employment actions and her protected activities. The decisionmakers had knowledge of Ms. Harris's complaints, and when viewed alongside the hostile work environment she endured, the temporal proximity sufficiently demonstrates that none of these actions were happenstance, nor were they "wholly unrelated."

### C. Ms. Harris's testimony, the timing and frequency of the disciplinary actions, and a co-worker's testimony all demonstrate that Public Health Trust's nondiscriminatory explanations are pretext.

Public Health Trust presented evidence that Ms. Harris was tardy and insubordinate to her superiors to justify its various disciplinary actions, DE #49 at 8–10, and the district court found that Ms. Harris "fail[ed] to rebut the presumption of nondiscrimination so as to sustain her retaliation charge" in response to the Public Health

43

Trust's nondiscriminatory explanations. *Id.* at 13. The district court erred because Ms. Harris "produce[d] sufficient evidence to allow a reasonable finder of fact to conclude that the . . . articulated reasons were not believable." *Brooks v. Cnty. Comm'n*, 446 F.3d 1160, 1163 (11th Cir. 2006) (citing *Jackson v. State of Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005)) (explaining that a plaintiff can show pretext "by pointing to 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions' in the proffered explanation"). In particular, Ms. Harris presented three sources of evidence of pretext that, when combined, make summary judgment inappropriate: (1) the temporal proximity between Ms. Harris's protected action and the sharp increase in workplace discipline; (2) Ms. Mells's testimony; and (3) Ms. Harris's own testimony.

First, the frequency of Ms. Harris's disciplinary actions, when considered in conjunction with Ms. Harris's other sources of evidence, demonstrates that Public Health Trust's proffered nondiscriminatory justifications are pretextual. *See Jackson v. Hennessy Auto*, 190 F. App'x 765, 768 (11th Cir. 2006) (acknowledging that temporal proximity can contribute to a finding of pretext). The frequency of disciplinary actions against Ms. Harris increased drastically after she reported Ms. Carreno's racist statement. *See* DE #49 at 2–3; DE #32-15 at 37. Specifically, in 2016, after she reported,

44

Ms. Harris received over a half dozen write-ups and suspensions, eventually culminating in her termination. DE #32-15 at 37. In contrast, in 2015, she received none. *Id.* at 37–38; DE #32 at 5–6. This drastic increase in disciplinary actions indicates that once Ms. Harris voiced her claims of race discrimination, she faced retaliatory action. When combined with Ms. Mells's and Ms. Harris's testimony, the evidence casts at least enough doubt on Public Health Trust's reasoning to survive summary judgment. *See, e.g.*, *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 921 (11th Cir. 1993) (finding an increase in scrutiny and harassment from supervisors and an increase in unfavorable performance evaluations immediately preceding and following the plaintiff's protected action supported a finding of pretext).

Second, Ms. Mells's testimony provides further evidence that, when combined with Ms. Harris's other sources, creates an issue of material fact on pretext. Ms. Mells stated that Ms. Harris "was constantly subjected to untrue, absurd, and baseless accusations, and then wrongfully disciplined." DE #42-5 at 3. Thus, Ms. Mells provides verification from a disinterested non-party that Public Health Trust's actions were pretextual. *See Freeman v. Perdue Farms Inc.*, 496 F. App'x 920, 927 (11th Cir. 2012) (concluding that affidavits of third parties that conflicted the defendant's version of events contributed to a finding of pretext); *Jones v. City of Heflin*, 207 F. Supp. 3d 1255, 1279 (N.D. Ala. 2016) (finding that evidence that circumstantially reflected the supervisor's

animus, when combined with evidence of dissimilar pre-opposition and post-opposition treatment, was sufficient to raise an issue of material fact regarding pretext).

Third, Ms. Harris's own testimony supports a finding of pretext when considered with her other sources of evidence. *See Munoz v. Selig Enters., Inc.*, 981 F.3d 1265, 1279 (11th Cir. 2020) (holding that the plaintiff's own testimony, which refuted each of the defendant's arguments, supported a finding of pretext because "[a] reasonable jury might well adopt [the plaintiff's] account of these material facts"); *Keene v. Prine*, 477 F. App'x 575, 582–83 (11th Cir. 2012) (finding that the plaintiffs' own testimony refuting the defendant's nondiscriminatory reasons, when combined with additional evidence such as lack of poor performance evaluations prior to the protected action, were sufficient to refute defendant's explanations). Ms. Harris testified that she believed the disciplinary actions she faced were retaliation for reporting Ms. Carreno's slur. DE #32-5 at 28; *see also* DE #42 at 4–6. She also believed she was targeted for disciplinary actions more than other employees because she was never provided information about whether other employees were written up for absenteeism when she requested it, and she disputes each account of insubordination, providing reasonable explanations. DE #43 at 2, 9–10; DE #32-5 at 54. Ms. Harris's testimony thus contradicts Public Health Trust's nondiscriminatory reasoning.

Finally, Ms. Carreno's slur itself also demonstrates discriminatory animus that calls into question Public Health Trust's nondiscriminatory reasons, and even if this Court does not find that Ms. Carreno's slur is direct evidence, it can still support a finding of pretext. *See Jones v. Bessemer Carraway Med. Ctr.*, 151 F.3d 1321, 1323 n.11 (11th Cir. 1998) ("Language not amounting to direct evidence, but showing some racial animus, may be significant evidence of pretext once a plaintiff has set out the prima facie case."). Ultimately, when all of this evidence is taken together—the timeline of disciplinary actions, Ms. Mells's testimony, Ms. Harris's testimony, Ms. Carreno's slur—it is sufficient to create an issue of material fact and survive summary judgment. The district court was wrong to find otherwise.

## Conclusion

The district court granted Public Health Trust's motion for summary judgment because it found that no genuine issue of material fact existed. But Ms. Harris's evidence of race discrimination, retaliation, and a hostile work environment contradicts that finding. This Court should reverse.

Date: February 4, 2022

Respectfully submitted,

/s/ Thomas Burch
Thomas V. Burch
Anna W. Howard
Courtney Hogan, Student Counsel
Kirstiana Perryman, Student Counsel
Appellate Litigation Clinic
University of Georgia School of Law
225 Herty Drive
Athens, Georgia 30602
(706) 542-5236

## Certificate of Compliance

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 11,268 words, excluding the parts of the brief carved out by Fed. R. App. P. 32(f) and 11th Cir. R. 32-4.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Goudy Old Style font.

/s/ Thomas Burch
Thomas V. Burch
Anna W. Howard
Courtney Hogan, Student Counsel
Kirstiana Perryman, Student Counsel
Appellate Litigation Clinic
University of Georgia School of Law
225 Herty Drive
Athens, Georgia 30602
(706) 542-5236

## Certificate of Service

I, Thomas Burch, certify that I served this Appellant's Opening Brief via the Court's ECF system on February 4, 2022, and that I mailed 4 copies to the Clerk of the Court on the same date.

/s/ Thomas Burch
Thomas V. Burch
Anna W. Howard
Courtney Hogan, Student Counsel
Kirstiana Perryman, Student Counsel
Appellate Litigation Clinic
University of Georgia School of Law
225 Herty Drive
Athens, Georgia 30602
(706) 542-5236