Case No. 21-11016

In the United States Court of Appeals
for the Eleventh Circuit

Mary E. Harris,
Appellant

v.

Public Health Trust of Miami-Dade County,
Appellee

On appeal from the United States District Court
for the Southern District of Florida

## Appellant's Reply Brief

Thomas V. Burch
Anna W. Howard
Courtney Hogan, Student Counsel
Kirstiana Perryman, Student Counsel
Appellate Litigation Clinic
University of Georgia School of Law
225 Herty Drive
Athens, Georgia 30602
tvburch@uga.edu
(706) 542-5236

**<u>Certificate of Interested Persons, Mary Harris v.</u>**
**<u>Public Health Trust of Miami-Dade County, Case No. 21-11016</u>**

We certify that the Certificates of Interested Persons and Corporate Disclosure Statements filed in our opening brief and Public Health Trust's response brief are complete.

# Table of Contents

Argument ................................................................................................... 1

I.     Ms. Harris presented sufficient direct discrimination evidence to
       survive summary judgment.................................................................... 2

       A. Ms. Harris presented her direct evidence argument below ......................... 2

       B. Public Health Trust does not rebut our argument that Ms.
          Carreno's racist statements constitute direct evidence............................... 6

       C. Because Ms. Harris presented direct evidence of discrimination,
          the *McDonnell Douglas* framework does not apply and Ms. Harris
          is not required to show pretext .................................................................. 10

II.    Public Health Trust asks this Court to view each aspect of Ms. Harris's
       hostile work environment claim individually ...................................... 10

       A. Ms. Carreno saying "[B]lacks are lazy" ................................................. 12

       B. Ms. Carreno following Ms. Harris ......................................................... 14

       C. Ms. Carreno denying Ms. Harris access to the supply closet..................... 15

       D. Ms. Carreno asking for evidence to get rid of Ms. Harris ........................ 16

III.   Ms. Harris raised her retaliation claim below, and Ms. Nieves's alleged
       investigation does not affect it ............................................................. 17

       A. Ms. Harris argued below that her internal complaints were
          protected activities, and she had an objectively reasonable belief
          that she was reporting race discrimination.................................................. 18

       B. Ms. Nieves's alleged investigation has no bearing on Ms. Harris's
          retaliation claims .................................................................................... 20

       C. Public Health Trust's purported nondiscriminatory reasons for
          discipline were pretext............................................................................ 22

Conclusion ................................................................................................25

Certificate of Compliance

Certificate of Service

# Table of Citations

## Cases

*Access Now, Inc. v. Sw. Airlines Co.,*
  385 F.3d 1324 (11th Cir. 2004) ...................................................... 17

*Ayissi-Etoh v. Fannie Mae,*
  712 F.3d 572 (D.C. Cir. 2013) ................................................... 12–13

*Bienkowski v. Jordan Props. Inc.,*
  No. CA 4:11-2452-RBH-KDW,
  2013 WL 806330 (D.S.C. Feb. 14, 2013) ..................................... 7–8

*Brown v. Nguyen,*
  No. 7:08-817-HFF-WMC,
  2010 WL 836819 (D.S.C. Mar. 5, 2010) ........................................... 8

*Burlington Indus., Inc. v. Ellerth,*
  524 U.S. 742 (1998) ...................................................................... 13

*Chapter 7 Tr. v. Gate Gourmet, Inc.*
  683 F.3d 1249 (11th Cir. 2012) ...................................................... 21

*Clover v. Total Sys. Servs., Inc.,*
  176 F.3d 1346 (11th Cir. 1999) ...................................................... 19

*Farley v. Nationwide Mut. Ins. Co.,*
  197 F.3d 1322 (11th Cir. 1999) ................................................. 20–21

*Furcron v. Mail Ctrs. Plus, LLC,*
  843 F.3d 1295 (11th Cir. 2016) ...................................................... 19

*Jackson v. State of Ala. State Tenure Comm'n,*
  405 F.3d 1276 (11th Cir. 2005) ...................................................... 23

*Jefferson v. Sewon Am. Inc.,*
  891 F.3d 911 (11th Cir. 2018) ....................................................... 10

*Lindsey v. Am. Cast Iron Pipe Co.*,
    772 F.2d 799 (11th Cir. 1985)...............................................................9–10

*Llampallas v. Mini-Circuits, Lab. Inc.*,
    163 F.3d 1236 (11th Cir. 1998).................................................................4

*Mendoza v. Borden, Inc.*,
    195 F.3d 1238 (11th Cir. 1999)...........................................................11, 13

*Merritt v. Dillard Paper Co.*,
    120 F.3d 1181 (11th Cir. 1997)............................................................9–10

*Miles v. M.N.C. Corp.*,
    750 F.2d 867 (11th Cir. 1985)..............................................................9–10

*Mora v. Univ. of Mia.*,
    15 F. Supp. 2d 1134 (S.D. Fla. 1998) ........................................................8

*\*Smelter v. S. Home Care Servs.*,
    904 F.3d 1276 (11th Cir. 2018)...................................................... 12, 14, 19

*Sonpon v. Grafton Sch., Inc.*,
    181 F. Supp. 2d 494 (D. Md. 2002)...........................................................8

*\*Staub v. Proctor Hosp.*,
    562 U.S. 411 (2011) ...............................................................................5–6, 25

*Vasell v. Am. Bldg. Maint. Ne. Janitorial, Inc.*,
    Nos. 08-CV-3318, 08-CV-3883,
    2010 WL 11623371 (E.D.N.Y. July 2, 2010) ....................................................9

*\*Woods v. Cantrell*,
    29 F.4th 284 (5th Cir. 2022).................................................................12–14

*Wright v. Southland Corp.*,
    187 F.3d 1287 (11th Cir. 1999)..................................................................4

**Secondary Sources**

William Sumner Jenkins, *Proslavery Thought in the Old South* (1935), *available at* https://babel.hathitrust.org/cgi/pt?id=mdp.39015005309268&view=1up&seq =277&skin=2021 ....................................................................................... 13

David Pilgrim & Philip Middleton, *Nigger and Caricature*, Ferris St. Univ. (2012), https://www.ferris.edu/HTMLS/news/jimcrow/caricature/homepage.htm ........... 14

## Argument

Ms. Harris is a Black nurse whose supervisor told her that she would not hire Black nurses because "Blacks are lazy." Ms. Harris reported these comments to Public Health Trust, but it never disciplined the supervisor. And Ms. Harris had to work under the supervisor for the next year knowing that she had not been disciplined. Meanwhile, after Ms. Harris reported the supervisor's comments, and after she told the supervisor that she, in fact, is Black, she was disciplined over a half dozen times in one year when she had not been disciplined at all the year before.

Public Health Trust nevertheless argues that Ms. Harris's disparate treatment, hostile work environment, and retaliation claims must fail. But it did not address a single one of the asterisked cases from our opening brief or some of the key facts underlying Ms. Harris's claims, like the fact that it never disciplined the supervisor. At bottom, Ms. Harris's case is straightforward: she worked for an openly racist supervisor who, after learning that Ms. Harris is Black, micromanaged her work, made her seek access to necessary supplies from a subordinate, and actively sought information that would help get her fired. Then, when Ms. Harris reported the supervisor's racist behavior, the supervisor was not disciplined, while Ms. Harris faced retaliatory discipline from others under the supervisor's influence. Based on those allegations, a genuine issue of fact exists for each of Ms. Harris's claims.

1

I.   **Ms. Harris presented sufficient direct discrimination evidence to survive summary judgment.**

We argued in our opening brief that Ms. Carreno's racist statements are direct evidence of discrimination because they correlate with the cycle of discriminatory actions that began when Ms. Carreno learned that Ms. Harris is Black. Public Health Trust, however, argues in response that Ms. Harris abandoned this argument because she did not allege that Ms. Carreno was a decisionmaker or that Ms. Carreno's racist statements were connected to her adverse employment actions. Then it argues, too, that even if Ms. Harris did preserve the argument, the racist statements are not direct evidence of discrimination and it had nondiscriminatory reasons for each of the adverse employment actions, none of which were pretext. We disagree on all counts.

**A. Ms. Harris presented her direct evidence argument below.**

Public Health Trust asserts that we, on appeal, have "strenuously argue[d] for the first time that 1) Carreno's statement was connected to the disciplinary actions at issue and 2) Carreno was a decisionmaker." Resp. Br. at 30–31. That's incorrect.

First, Ms. Harris always argued that Ms. Carreno's racist statements were connected to the adverse disciplinary actions that she faced. For example, Ms. Harris argued in her summary judgment response that as soon as Ms. Carreno learned that Ms. Harris is Black, "Carreno began to treat Ms. Harris as [Ms. Harris] observed [Carreno] treating all other African American employees—different and unfairly." DE #43 at 3–

2

4 (explaining that following her complaint, Public Health Trust's "racially discrimina-tory conduct toward Ms. Harris worsened and their retaliatory acts of writing her up ensued"). She alleged, in fact, that reporting Ms. Carreno's discrimination marked the beginning of a "vicious cycle" of harassment where "Ms. Harris would endure [Public Health Trust's] racially discriminatory conduct for as long as she could tolerate, Ms. Harris would then complain of the racially discriminatory conduct, [Public Health Trust] would not investigate or adequately respond to Ms. Harris's complaint(s), and Ms. Harris's supervisors would respond with discipline by issuing a Disciplinary Ac-tion Report (DAR) (i.e., write up) or suspension." *Id.* at 3–5. In short, Ms. Harris argued to the district court that Ms. Carreno's racist statements were connected to her disciplinary actions.

Second, Ms. Harris has always contended that 'Carreno was a decisionmaker' for disparate treatment purposes because Ms. Carreno's racial animus caused Ms. Lys and Ms. Freeman to discipline Ms. Harris, ultimately resulting in Ms. Nieves termi-nating her. *See, e.g.,* DE #43 at 4–5, 7–8. For example, in response to Public Health Trust's summary judgment motion, Ms. Harris alleged that Ms. Carreno instructed other supervisors to discipline her and that her "supervisors would respond with dis-cipline" whenever she complained about Ms. Carreno's discriminatory conduct. *Id.* (arguing that Ms. Carreno's racist statements are direct evidence of discrimination

3

(citing, e.g., DE #32-5 at 28, 31, 41[1])); DE #32-5 at 27–28, 31, 41 (explaining how Ms. Carreno "wanted [her] out," how Ms. Lys engaged in "continuous harassment under the direction of Gianella Carreno," and how Ms. Freeman told her that her three-day suspension "was under the direction of Gianella [Carreno]"). In other words, Ms. Harris has always alleged that Ms. Carreno was the driving force behind her disciplinary actions—contrary to Public Health Trust's characterization of Ms. Harris's arguments on appeal. That is sufficient to create a material fact dispute on her disparate treatment claim. *See, e.g.,Wright v. Southland Corp.*, 187 F.3d 1287, 1304 n.20 (11th Cir. 1999) (recognizing that a "cat's paw" theory applies when "a person with discriminatory animus manipulates the decisionmaker"); *Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1249 (11th Cir. 1998) (explaining that the theory applies when a decisionmaker "acted in accordance with the harasser's decision without herself evaluating the employee's situation").

Even so, Public Health Trust argues that Ms. Nieves conducted an "independent investigation" before terminating Ms. Harris, thus negating her disparate treatment claim. Resp. Br. at 48–49. But that says nothing about the disciplinary actions

---

[1] For clarity, this brief uses the CM/ECF pagination as opposed to the deposition's internal pagination that was cited below.

preceding her termination (e.g., the DARs or the three-day suspension) or the conse-quences flowing from those disciplinary actions. Plus, when Ms. Nieves described her independent investigation, she twice stated that she relied on the disciplinary recom-mendation of Ms. Freeman—one of the supervisors who was aware of, and allegedly participated in, Ms. Carreno's discrimination. DE #32-15 at 3. There is no indication in Ms. Nieves's description of her investigation that she questioned Ms. Freeman about her interactions with Ms. Carreno or her responses to Ms. Carreno's conduct. *See id.*; *see also Staub v. Proctor Hosp.*, 562 U.S. 411, 421 (2011) ("[T]he supervisor's biased report may remain a causal factor if the independent investigation takes it into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified.").

Finally, and perhaps most importantly, when Ms. Nieves met with Ms. Harris prior to terminating her, Ms. Harris described Ms. Carreno's discrimination and "brought up everything that [she] was subjected to." DE #32-5 at 25. That matters because Ms. Nieves responded by saying, before any investigation, that she "knows" Ms. Carreno and that Ms. Carreno is "not that kind of person." *Id.* In other words, based on her relationship with Ms. Carreno, she had already cleared Ms. Carreno of any wrongdoing before investigating (1) Ms. Harris's allegations, (2) Ms. Harris's dis-ciplinary history, or (3) the justifications for Ms. Harris's termination. *Id.* Because of

that, there is at least a question of material fact regarding whether Ms. Nieves's "independent" investigation was sufficient to negate cat's paw liability for Ms. Harris's termination. *See Staub*, 562 U.S. at 421 ("We are aware of no principle in tort or agency law under which an employer's mere conduct of an independent investigation has a claim-preclusive effect. Nor do we think the independent investigation somehow relieves the employer of 'fault.'").

### B. Public Health Trust does not rebut our argument that Ms. Carreno's racist statements constitute direct evidence.

We argued in our opening brief that Ms. Harris faced continual discrimination that (1) started when Ms. Carreno learned that Ms. Harris is Black, (2) resulted in Ms. Harris being disciplined multiple times over the following year, and (3) culminated in Ms. Harris's termination. Public Health Trust does not respond to this argument in its response brief, and instead tries to characterize Ms. Harris's case as involving only two events: Ms. Carreno's racist statements and Ms. Harris's termination. Ms. Harris's claims cannot be so reduced.

After Ms. Carreno made the racist statements to Ms. Harris, Ms. Harris had to continue working under her for over a year, and over that time Ms. Harris alleges that Ms. Carreno began discriminating against her because of her race by, for example, micromanaging her work and limiting her access to necessary supplies. *See, e.g.*, DE # 43 at 4 (stating that Ms. Harris "was tormented by her supervisor Gianella Carreno's

6

. . . racially discriminatory conduct," which was "continual[]" and began as soon as Ms. Carreno learned that Ms. Harris is Black). That discrimination, as Ms. Harris explained, resulted in her being disciplined over half a dozen times in the following year, when she had not been disciplined at all the year before. DE #43 at 4; DE #32-15 at 37; DE #32 at 5–6. And it was those disciplinary actions that resulted in her termination. DE #43 at 4; DE #32-29 at 4. In other words, the disciplinary actions (and Ms. Carreno's role in instigating the disciplinary actions) cannot be excised when examining Ms. Harris's direct-evidence-of-disparate-treatment argument.

Rather than acknowledging that basic point, Public Health Trust cites non-binding district court cases to show that Ms. Carreno's racist statements are not direct evidence of disparate treatment. But all of those cases refer to circumstances where the plaintiff unsuccessfully alleged that discriminatory statements alone, without other indicia of discrimination or a relationship to the plaintiffs' adverse employment events, were direct evidence. Specifically:

- *Bienkowski v. Jordan Props., Inc.*, No. CA 4:11-2452-RBH-KDW, 2013 WL 806330, at **6–7 (D.S.C. Feb. 14, 2013) (finding no direct evidence where the plaintiff only alleged two possibly derogatory remarks, the plaintiff did not re-

port the statements around the time they occurred, and the first alleged derogatory remark occurred during an evaluation where the plaintiff received a promotion and a raise), *R. & R. adopted,* 2013 WL 810298 (D.S.C. Mar. 5, 2013);

- *Brown v. Nguyen,* No. 7:08-817-HFF-WMC, 2010 WL 836819, at **2–3, 15 (D.S.C. Mar. 5, 2010) (finding that a single remark was not direct evidence where there was "absolutely no evidence that [the] alleged comment had any relationship to the plaintiff's termination" and the decisionmakers were never told about the discriminatory statement);

- *Sonpon v. Grafton Sch., Inc.,* 181 F. Supp. 2d 494, 499 (D. Md. 2002) (finding no direct evidence where the plaintiff only alleged one discriminatory comment that occurred after the plaintiff's supervisors decided not to promote her);

- *Mora v. Univ. of Mia.,* 15 F. Supp. 2d 1324, 1333–34 & n.5 (S.D. Fla. 1998) (incorrectly stating that *McDonnell Douglas* applies to direct evidence cases, albeit in a "substantially altered" form, and finding no direct evidence where the plaintiff only alleged a single "actionable" discriminatory statement that was made in connection with his national origin but was never reported to the decisionmaker);

- *Vasell v Am. Bldg. Maint. Ne. Janitorial, Inc.*, Nos. 08-CV-3318, 08-CV-3883, 2010 WL 11623371, at **6–7 (E.D.N.Y. July 2, 2010) (finding that a single derogatory statement that was not reported to the decisionmaker, without other indicia of discrimination, was insufficient).

Those cases bear no relationship to Ms. Harris's. Rather than simply alleging an isolated and unreported remark, Ms. Harris describes a "vicious cycle" of discrimination that started when Ms. Carreno learned that Ms. Harris is Black and continued for over a year, ending only because Ms. Harris was discharged as a result of Ms. Carreno's influence. In short, Public Health Trust's reliance on those cases is misplaced.

In fact, in support of our argument that Ms. Carreno's racist remarks constitute direct evidence, we cited *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir. 1997), *Miles v. M.N.C. Corp.*, 750 F.2d 867, 874–76 (11th Cir. 1985), and *Lindsey v. American Cast Iron Pipe Co.*, 772 F.2d 799, 801–02 (11th Cir. 1985) in our opening brief. Public Health Trust does not mention any of these binding cases in its response. That matters because these cases demonstrate that Ms. Carreno's racist statements are neither too remote nor too attenuated to constitute direct evidence because they correlate to the type of adverse employment actions that Ms. Harris experienced, and because Ms. Harris faced continuous discrimination during the time that passed between the statements and her adverse actions. Those cases show, in other words, that

9

Ms. Harris has a valid direct evidence claim. *See Merritt*, 120 F.3d at 1189; *Miles*, 759 F.2d at 874–76; *Lindsey*, 772 F.2d at 801–02.

**C. Because Ms. Harris presented direct evidence of discrimination, the *McDonnell Douglas* framework does not apply and Ms. Harris is not required to show pretext.**

Public Health Trust argues in its response brief that Ms. Harris "certainly has not demonstrated that there was sufficient evidence of pretext to avoid summary judgment on the disparate treatment claim." Resp. Br. at 26–27, 33 (referring to the *McDonnell Douglas* framework). That framework, however, applies only when a plaintiff has not shown direct evidence of discrimination. *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 921–22 (11th Cir. 2018) (stating that "the district court may not grant summary judgment" if the plaintiff presents direct evidence that, "if believed by the jury, would be sufficient to win at trial"). This is true, in fact, "even where the movant presents conflicting evidence." *Merritt*, 120 F.3d at 1189. In short, since Ms. Harris has presented direct evidence that, if believed by the jury, would be sufficient to win at trial, she does not need to satisfy the *McDonnell Douglas* framework or present pretext evidence to survive summary judgment on her disparate treatment claim.

**II. Public Health Trust asks this Court to view each aspect of Ms. Harris's hostile work environment claim individually.**

In our opening brief, we argued that Ms. Harris endured a hostile work environment because her openly racist supervisor micromanaged her, restricted her from

certain work duties, asked her co-worker for information that could get her fired, restricted her access to the supply closet, instructed another co-worker to write her up, and instructed another co-worker to discipline her. Opening Br. at 22, 30. Instead of grappling with the cumulative weight of Ms. Harris's treatment, Public Health Trust's response brief only addresses select aspects on individual grounds. That is not how this Court analyzes Title VII hostile work environment claims. *See Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999) ("The courts should examine the conduct in context, not as isolated acts, and determine [the severity and pervasiveness of the harassment] under the totality of the circumstances.").

Here's the bottom line: Ms. Harris was harassed daily by a supervisor who believed that Ms. Harris's entire race was lazy and unworthy of employment with Public Health Trust. Plus, Ms. Harris knew that Public Health did not punish the racist supervisor in any way, leaving the supervisor's racist comments and subsequent behavior unchecked. A reasonable juror would find that such an environment was objectively hostile. With that in mind, rather than rehash each aspect of the harassment Ms. Harris endured, we address and give context to the four pieces of evidence that Public Health Trust picked out to critique as isolated acts.

11

## A. Ms. Carreno saying "[B]lacks are lazy".

Public Health Trust argues that Ms. Carreno only made "derogatory" statements to Ms. Harris "once," which is not enough to create a hostile work environment. Resp. Br. at 36, 38. But the statement "Blacks are lazy" is not "derogatory," as Public Health Trust suggests. *Id.* at 36. It is racist; there's no other reasonable way to describe it. And Public Health Trust cannot downplay the statement by saying that Ms. Carreno said it only once. *Id.* at 36, 38. Given that it was a severely racist statement, one time was enough, as this Court acknowledged in *Smelter v. Southern Home Care Services*, a case that Public Health Trust never addressed in its response brief. 904 F.3d 1276, 1286 (11th Cir. 2018) (explaining that statements like "black men are 'lazy' . . . are sufficiently severe to create a hostile work environment").

That point was recently confirmed, in fact, by the Fifth Circuit in *Woods v. Cantrell*, 29 F.4th 284, 285–86 (5th Cir. 2022). There, the court repudiated the argument that "a single instance of a racial epithet . . . cannot support a hostile work environment claim." *Id.* (finding that calling someone a "Lazy Monkey A___ N___" one time created a hostile work environment). To reach that conclusion, the court emphasized that some racist statements are so severe that it takes only one utterance to establish a valid claim. *Id.* (citing *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 580 (D.C. Cir. 2013) (Kavanaugh, J., concurring) ("[I]n my view, being called the n-word by a

supervisor—as [plaintiff] alleges happened to him—suffices by itself to establish a racially hostile work environment.")).

Here, the reason the statement "Blacks are lazy" is sufficiently severe to create a hostile work environment, even if stated only once, is twofold. First, the person who said it was Ms. Harris's supervisor, and she did so while also saying that she would not hire any Black nurses, thereby letting Ms. Harris know that African Americans were not welcome in her workplace. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 763 (1998) (explaining that a "supervisor's power and authority invests his or her harassing conduct with a particular threatening character"). Second, ascribing laziness to the entire African American race is no different from using the N-word as far as a Black woman is concerned. *See Mendoza*, 195 F.3d at 1246 ("[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position."). That's in part because the apparent biological, predisposed laziness of the African American race was the driving justification for slavery. *See* William Sumner Jenkins, *Proslavery Thought in the Old South* 251 (1935), *available at* https://babel.hathitrust.org/cgi/pt?id=mdp.39015005309268&view=1up&seq=277&skin=2021 ("It was the general testimony of slaveholders that the Negro was . . . habitually indolent and opposed to exertion, which condition necessitated a master to force him to work."). It's in part, too, because the notion of laziness underlies and is entwined with

the use of the N-word—a point driven home by the racist supervisor in *Woods* when he linked the two in a single slur. *Woods*, 29 F.4th at 285–86; *see also* David Pilgrim & Philip Middleton, *Nigger and Caricature*, Ferris State Univ. (2012), https://www.ferris.edu/HTMLS/news/jimcrow/caricature/homepage.htm ("Whether used as a noun, verb, or adjective, [the N-word] reinforced the stereotype of the *lazy*, stupid, dirty, worthless parasite." (emphasis added)). In short, telling a Black woman her entire race is lazy is not less racist than using the N-word. Those are equally severe insults, and when stated by a supervisor each is sufficient to establish a hostile work environment claim, even if stated just once. *See Smelter*, 904 F.3d at 1286 (concluding that this exact type of statement is sufficiently severe to create a hostile work environment).

## B. Ms. Carreno following Ms. Harris.

Public Health Trust argues that "following an employee at work is insufficient evidence to establish a racially hostile work environment." Resp. Br. at 37. That argument might hold water if we argued that Ms. Carreno following Ms. Harris was sufficient on its own. But we did not. Instead, Ms. Carreno's act of following Ms. Harris is colored by her racist statements and thus contributes to the overall hostile work environment. Public Health Trust nevertheless argues that Ms. Carreno had to continue making racist statements while following her to establish a hostile work environment claim. *Id.* ("During this alleged following around, there is not even [an] allegation

14

that any racial comment [was] made."). That argument misses the mark. The point is that Ms. Harris knew that her racist supervisor was only following and micromanaging her daily because of a racist belief that she and her entire race could not be trusted *due to their inherent laziness*. Accordingly, that's why being followed was "intimidating," as Ms. Harris alleged and as a reasonable trier of fact would agree. DE #32-26 at 2.

### C. Ms. Carreno denying Ms. Harris access to the supply closet.

It was only after Ms. Carreno found out that Ms. Harris is Black and not Hispanic that she denied Ms. Harris access to the supply closet. DE #32-5 at 35. That racially motivated harassment adds to the hostility of Ms. Harris's work environment. Ignoring that fact, Public Health Trust claims that Ms. Harris did not argue below that she was denied access on account of her race, and that the impact was minimal since Ms. Harris could gain access by waiting for another employee to open the closet.

As to the first point, Public Health Trust claims that Ms. Harris "did not argue that some type of inference should be made which would support an argument that Harris was denied access to the medical supply room because of her race." Resp. Br. at 35. To the contrary, Ms. Harris argued that she was denied access to the supply room on account of her race because she once had access and was subsequently denied access after Ms. Carreno found out she is Black and not Hispanic. *See* Opening Br. at 43 (citing DE #49 at 11, 13); DE #32-5 at 35.

15

As to the second point, Public Health Trust argues that Ms. Harris had to "simply ask[] another employee for access" to the supply closet. Resp. Br. at 35. But that fails to address the fact that a racist supervisor orchestrated that hurdle for Ms. Harris *because of her race*. DE #32-5 at 35. Moreover, the employee Ms. Harris had to wait on for access was lower in rank. *Id.* at 36 (noting that Ms. Harris had to ask a medical assistant for access to the supply closet); DE #42-5 at 2 (explaining that LPNs, like Ms. Harris, oversee medical assistants). So, when the denial of access to supplies is considered in light of the other ways Ms. Harris was mistreated, a reasonable juror could find that Ms. Harris was working in a hostile work environment.

### D. Ms. Carreno asking for evidence to get rid of Ms. Harris.

Ms. Carreno called Ms. Harris's co-worker in an attempt to gather evidence that would justify firing her. According to Public Health Trust, this Court should not consider that fact because we raised it for the first time on appeal. But Ms. Harris testified about that fact in her deposition, and Public Health Trust attached her deposition to its summary judgment motion. DE #32-5 at 32. And while true that Ms. Harris did not raise this specific fact in her summary judgment response, that does not prevent her from mentioning or relying on it now, because she is not raising a new legal theory; instead, she is highlighting a record fact that is consistent with the facts and theory that she already raised. At the end of the day, Ms. Harris's argument on appeal is still

the same as her original Title VII hostile work environment claim, and she raised the substance of this claim below. *See* DE #43 at 4 ("[S]he was tormented by her supervisor Gianella Carreno[].").

That being so, this appeal is unlike the instances in which this Court finds "new issues" were raised. For example, in *Access Now*, which Public Health Trust cites, the plaintiff attempted to present "a very different theory" by relying on an entirely different statutory provision on appeal. *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1328 (11th Cir. 2004). That new statutory claim required "an analysis that the district court was never asked to perform." *Id.* at 1332. Ms. Harris has done nothing similar.

## III.  Ms. Harris raised her retaliation claim below, and Ms. Nieves's alleged investigation does not harm it.

Public Health Trust makes three arguments regarding Ms. Harris's retaliation claim. The first is that Ms. Harris's internal complaints were insufficient to mount a retaliation claim; the second is that Ms. Nieves's "independent" investigation and termination decision shield Public Health Trust from liability; and the third is that the reason for Ms. Harris's termination was not pretextual. We disagree with each.

17

**A. Ms. Harris argued below that her internal complaints were protected activities, and she had an objectively reasonable belief that she was reporting race discrimination.**

With regard to Ms. Harris's internal complaints, Public Health Trust states in its response brief: (1) that Ms. Harris has not argued, until this appeal, that her internal complaints were protected activities; and (2) that she did not have an objectively reasonable belief that what she complained of was race discrimination. Neither statement is correct.

First, Ms. Harris argued in her deposition and in her response to summary judgment, as the district court noted, "that she had never been 'written up' until after she first complained of discrimination." DE #49 at 12. In its response brief, Public Health Trust cites this portion of the district court's order, then two sentences later suggests that Ms. Harris's argument that the internal complaints were protected activities "must be rejected" because she "did not adequately present [this] to the district court." Resp. Br. at 44–45. But as Public Health Trust concedes by citing the order, the district court acknowledged Ms. Harris's allegation that she complained internally. It simply went on to find that Ms. Harris did not flesh out enough details about those complaints. *See* DE #49 at 12. We disagreed with that conclusion in our opening brief, and arguing as much on appeal does not raise a new issue as Public Health Trust

suggests. Rather, this argument was preserved because the district court expressly ruled on it below.

Second, Ms. Harris held an objectively reasonable belief that her internal race discrimination complaints were protected activities. In its response, Public Health Trust argues that Ms. Harris had to establish a prima facie violation of Title VII before her discrimination belief could be objectively reasonable. Resp. Br. at 46 (concluding that Ms. Harris's belief was not objectively reasonable because "[o]pposition to the remark 'Blacks are lazy' . . . is not statutorily protected activity under Title VII"). That's not right. For starters, Ms. Harris need only complain of actions that are "close enough" to violating "existing substantive law." *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1351 (11th Cir. 1999); *see also Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1311 (11th Cir. 2016) (same). Ms. Harris did that. After all, the statement Ms. Harris complained of—"[B]lacks are lazy"—is "sufficiently severe to create a hostile work environment." *See Smelter*, 904 F.3d at 1286 (discussing the functional equivalent, "black men are lazy"). On top of that, Ms. Harris also complained that a Public Health Trust supervisor admitted to discriminatory hiring practices (unquestionably a violation of Title VII). *See* DE #32-5 at 19 ("[S]he said . . . she's not hiring any [Blacks]."). On that point, in fact, the EEOC evaluated Ms. Harris's complaints and found that the evidence "establishe[d] Reasonable Cause to believe [Public Health Trust] discriminated

19

against [Ms. Harris]." DE #32-33 at 3. Her complaints were thus "close enough," meaning that she had an objectively reasonable belief that she was complaining of race discrimination.

## B. Ms. Nieves's alleged investigation has no bearing on Ms. Harris's retaliation claims.

Public Health Trust asserts three points regarding Ms. Nieves's "independent" investigation: (1) that Ms. Nieves's investigation defeats Ms. Harris's retaliation claim based on her termination; (2) that we raised Ms. Nieves's knowledge of Ms. Harris's internal complaints for the first time on appeal; and (3) that Ms. Nieves had no knowledge of Ms. Harris's internal complaints. All should fail.

As to the first point, Public Health Trust argues that because Ms. Nieves performed an investigation, Ms. Harris's termination was free from the taint of Ms. Carreno's racism. Resp. Br. at 48. But Ms. Nieves's investigation does not help Public Health Trust. For starters, the investigation was not "independent," as explained in Section I(A). On top of that, the causal connection element is established for Ms. Nieves's termination decision independent of any potential influence by Ms. Carreno. Specifically, Ms. Harris just has to show that her protected activity (reporting discrimination to Ms. Nieves) and her adverse employment action (being terminated by Ms Nieves) were not "wholly unrelated." *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999). The "wholly unrelated" test examines (1) the decisionmaker's

knowledge of a protected activity, and (2) the temporal proximity of the termination to that knowledge. *Id.* A mere twelve days passed between Ms. Harris complaining to Ms. Nieves and being terminated, and Ms. Harris alleged that she "brought up everything that [she] was subjected to" when she met with Ms. Nieves. DE #32-5 at 25. That showing is sufficient to establish the causal connection element. *See Farley*, 197 F.3d at 1337 (holding that "seven weeks" was "sufficiently proximate to create a causal nexus for the purposes of establishing a prima facie case"); *see also Chapter 7 Tr. v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1260 (11th Cir. 2012) ("[This Court] construe[s] the causal link element broadly.").[2]

As to the second point, even though Public Health Trust says that we raised Ms. Nieves's knowledge of the complaints for the first time on appeal, that's not correct. Rather, in Ms. Harris's response to Public Health Trust's statement of facts, she argued that "Caridad Nieves terminated Plaintiff *in retaliation* for Plaintiff's prior complaints of racial discrimination." DE #42 at ¶ 30 (emphasis added); *see also* DE #43 at 18–19 (same); DE #32-5 at 25 (explaining how Ms. Harris "brought up everything that [she] was subjected to" when she met with Ms. Nieves). The argument was made below.

---

[2] Public Health Trust also lists Ms. Harris's "suspensions" in its subhead "D.," which seemingly serves to apply its "independent investigation" argument to Ms. Harris's three-day suspension as well. Resp. Br. at 48. Ms. Nieves, however, did not issue the three-day suspension—Ms. Freeman did. DE #32-5 at 26. Thus, Ms. Nieves's alleged investigation has no affect on the retaliatory three-day suspension.

As to the third point, Public Health Trust argues that Ms. Nieves's statement to Ms. Harris that "she [Ms. Carreno] is not like that," cannot be used to infer knowledge of Ms. Harris's complaints. Resp. Br. at 47 ("[T]he undisputed record evidence before the District Court is that CNO Ms. Nieves did not have knowledge of the internal complaints."). The problem is that Public Health Trust fails to offer any explanation for what that statement could have been referring to, if not to Ms. Harris's complaint about Ms. Carreno's racist statements and subsequent harassment.

Finally, beyond all of that, Public Health Trust wrongfully assumes that Ms. Harris's entire retaliation claim hinges upon the issue of Ms. Nieves's investigation; it does not. Rather, Ms. Harris also argued that the three DARs she was issued and her suspensions were retaliatory. *See* Opening Br. at 48–51, 52–53; DE #43 at 18–19; DE #32-5 at 25. Ms. Nieves did not authorize those disciplinary actions, and Public Health Trust did not wrestle with those separate grounds for Ms. Harris's retaliation claim. This Court should reverse for that reason alone.

## C. Public Health Trust's purported nondiscriminatory reasons for discipline were pretext.

Finally, Public Health Trust claims that, to meet her pretext burden, Ms. Harris must demonstrate that her supervisors "did not have a reasonable belief in the basis for the discipline" to avoid summary judgment. Resp. Br. at 54 (citing no authority). But Ms. Harris does not bear such a high burden. This Court's pretext standard is

22

whether a reasonable factfinder could conclude that the employer's stated reasons "are not believable." *Jackson v. State of Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005) (explaining that a plaintiff can meet this standard by demonstrating "that a discriminatory reason more likely motivated the employer").

Here, Ms. Harris meets that standard. She was disciplined over a half dozen times after she reported Ms. Carreno's racist statements; her coworker confirmed that her superiors discriminated against Black nurses at Public Health Trust facilities; and she testified that after she reported Ms. Carreno, she was followed around the floor, improperly accused of misconduct, and denied access to necessary equipment. Opening Br. at 54–58; *see also* DE #42-5 at 3 (another Black LPN, Ms. Mells, describing Ms. Harris being "harass[ed]" and subjected to "untrue, absurd, and baseless" allegations of wrongdoing); DE #32-5 at 33, 35–36 (describing Ms. Carreno's harassment of Ms. Harris).

Public Health Trust argues that this evidence is insufficient because we must rebut the reason for each adverse employment action "head on." Resp. Br. at 49–50. But we have. That's because the response to each pretextual reason is the same: all of Ms. Harris's retaliation occurred because she reported race discrimination. Although Ms. Carreno was not the only actor involved in the disciplinary actions, her bias—as

reflected by her racist statements and subsequent treatment of Ms. Harris—infiltrated the decisions of each superior who punished Ms. Harris.

Ms. Carreno had significant influence over her co-workers' disciplinary decisions. For example, Ms. Carreno instructed another supervisor, Ms. Lys, to write up Ms. Harris and told Ms. Freeman, an administrator who oversaw employee discipline, to have Ms. Harris escorted from the hospital when she was suspended. DE #32-5 at 21, 27; *see also* DE #32-26 at 2 (explaining that Ms. Freeman told Ms. Harris to stop sending emails complaining of discrimination). Ms. Carreno also allied with Ms. Nieves, the highest ranking supervisor in Ms. Harris's unit. For instance, when Ms. Harris told Ms. Nieves about Ms. Carreno's racist statements, Ms. Nieves said that she knew Ms. Carreno well and that she was "not that kind of person." DE #32-5 at 25. These relationships demonstrate the extent of Ms. Carreno's involvement in other supervisors' discipline of Ms. Harris.

In addition to this influence, Ms. Carreno also sought to have Ms. Harris terminated directly. After Ms. Carreno learned that Ms. Harris is Black, she followed her, harassed her daily, and denied her access to necessary equipment. *See* Opening Br. at 14–18 (chronicling this discrimination in detail). Ms. Carreno even went so far as to ask for incriminating information on Ms. Harris because she "wanted [her] out." DE #32-5 at 31–32. In fact, when Ms. Harris asked her co-workers why she was being

treated unfairly, they directed her to "talk to Gia [Carreno]." *Id.* at 32. Ms. Harris endured this treatment for over a year, all while knowing that Ms. Carreno had never been disciplined for her racist statements and behavior.

Meanwhile, after Ms. Harris reported Ms. Carreno, she faced a sharp increase in discipline. In particular, she faced six disciplinary actions in the year after her first report, after not being disciplined at all in the year before. DE #32 at 5–6; DE #32-15 at 37; DE #32-29 at 4. Ms. Harris rebutted each of these disciplinary decisions at the time, including by arguing to Ms. Nieves directly that the discipline was retaliatory. DE #32-5 at 25. Those allegations at least put the supervisors on notice of potential discrimination, and they were required to conduct their own *independent* investigations of each alleged infraction to ensure that Ms. Carreno's discriminatory treatment was not the real reason for Ms. Harris's punishments. *See Staub*, 562 U.S. at 421. Whether all of the disciplinary actions were connected to Ms. Carreno's desire to get "her out" is thus a question of material fact for a jury to decide. Because of that, this Court should reverse.

<u>Conclusion</u>

The district court granted Public Health Trust's motion for summary judgment because it found that no genuine issue of material fact existed. But the evidence

supporting each of Ms. Harris's claims demonstrates otherwise. We respectfully ask this Court to reverse.

Date: May 4, 2022                                Respectfully submitted,

                                                /s/ Thomas Burch
                                                Thomas V. Burch
                                                Anna W. Howard
                                                Courtney Hogan, Student Counsel
                                                Kirstiana Perryman, Student Counsel
                                                Appellate Litigation Clinic
                                                University of Georgia School of Law
                                                225 Herty Drive
                                                Athens, Georgia 30602
                                                (706) 542-5236

26

<u>**Certificate of Compliance**</u>

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 5,959 words, excluding the parts of the brief carved out by Fed. R. App. P. 32(f) and 11th Cir. R. 32-4.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Goudy Old Style font.

<u>/s/ Thomas Burch</u>
Thomas V. Burch
Anna W. Howard
Courtney Hogan, Student Counsel
Kirstiana Perryman, Student Counsel
Appellate Litigation Clinic
University of Georgia School of Law
225 Herty Drive
Athens, Georgia 30602
(706) 542-5236

## Certificate of Service

I, Thomas Burch, certify that I served this Appellant's Opening Brief via the Court's ECF system on May 4, 2022, and that I mailed 4 copies to the Clerk of the Court on the same date.

/s/ Thomas Burch
Thomas V. Burch
Anna W. Howard
Courtney Hogan, Student Counsel
Kirstiana Perryman, Student Counsel
Appellate Litigation Clinic
University of Georgia School of Law
225 Herty Drive
Athens, Georgia 30602
(706) 542-5236